**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



| | |
|---|---|
| TWIN SECURITIES, INC., TWIN MASTER FUND, LTD., TWIN OPPORTUNITIES FUND, LP, P TWIN LTD., and HFR ED TWIN SECURITIES MASTER TRUST, | Civil Action No. ___ |
| Plaintiffs, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| AMERICAN REALTY CAPITAL PROPERTIES, INC., ARC PROPERTIES OPERATING PARTNERSHIP L.P., AR CAPITAL LLC, RCS CAPITAL, LLC, COLE REAL ESTATE INVESTMENTS, INC., NICHOLAS S. SCHORSCH, DAVID S. KAY, BRIAN S. BLOCK, LISA PAVELKA MCALISTER, WILLIAM KAHANE, LESLIE D. MICHELSON, WILLIAM G. STANLEY, EDWARD G. RENDELL, SCOTT J. BOWMAN, THOMAS A. ANDRUSKEVICH, SCOTT P. SEALY, SR., CHRISTOPHER H. COLE, MARC T. NEMER, JEFFREY C. HOLLAND, STEPHAN KELLER, D. KIRK MCALLASTER, JR., LEONARD W. WOOD, and GRANT THORNTON LLP, | |
| Defendants. | |

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................ 1

II.     JURISDICTION AND VENUE ................................................................. 5

III.    PARTIES ...................................................................................................... 6

        A.      Plaintiffs ......................................................................................... 6

        B.      Defendants ...................................................................................... 7

IV.     SUMMARY OF THE CASE ..................................................................... 13

        A.      Defendant Schorsch's REIT Empire ........................................ 13

        B.      The Significance And Importance Of "Adjusted Funds From
                Operations" ................................................................................... 15

        C.      American Realty's Campaign To Rapidly Grow Through Mergers
                And Acquisitions ......................................................................... 18

        D.      American Realty's Acquisition Binge Was Highly Profitable For
                Defendant Schorsch's Empire And American Realty's Executives ..................... 21

        E.      American Realty Rebukes Doubters And Assures Investors That
                The Company's Internal Controls Are Effective and Functioning
                Properly ......................................................................................... 22

        F.      Unknown To Investors At The Time, American Realty
                Intentionally Misstates The Company's AFFO ......................... 23

        G.      American Realty's Audit Committee Discloses That Its Top
                Officers Intentionally Misrepresented The Company's AFFO ............. 26

        H.      Defendants Schorsch And Kay Unexpectedly "Resign" ....................... 30

V.      ADDITIONAL ALLEGATIONS OF SCIENTER ................................. 31

VI.     MATERIALLY FALSE AND MISLEADING STATEMENTS ....................... 35

        A.      First Quarter 2013 Financial Results ........................................ 36

        B.      CapLease Acquisition Announcement ....................................... 40

        C.      ARCT IV Merger Announcement ............................................... 41

        D.      July 2013 Investor And Analyst Day ......................................... 43

        E.      Second Quarter 2013 Financial Results ..................................... 45

F.     Cole Merger Announcement And Press Release ................................................... 48

G.     Third Quarter 2013 Financial Results .................................................................... 53

H.     Cole Merger Presentation ...................................................................................... 55

I.     Cole Merger Proxy Materials................................................................................. 56

J.     Cole Merger Closing............................................................................................... 59

K.     Fourth Quarter And Year-End 2013 Financial Results ......................................... 62

L.     Grant Thornton's Audit Opinion ............................................................................ 69

M.    First Quarter 2014 Financial Results ..................................................................... 74

N.     May 21, 2014 Stock Offering ................................................................................ 78

O.     Second Quarter 2014 Financial Results.................................................................. 81

VII.    AMERICAN REALTY VIOLATED GAAP AND SEC RULES ................................... 87

VIII.   NO SAFE HARBOR ...................................................................................................... 88

IX.     PLAINTIFFS' RELIANCE ............................................................................................. 89

X.     LOSS CAUSATION ....................................................................................................... 94

XI.     CLAIMS FOR RELIEF .................................................................................................. 96

XII.    PRAYER FOR RELIEF ................................................................................................ 107

XIII.   JURY TRIAL DEMAND .............................................................................................. 107

This action is brought by Twin Securities, Inc., Twin Master Fund, Ltd., Twin Opportunities Fund, LP, P Twin Ltd., and HFR ED Twin Securities Master Trust (collectively, "Plaintiffs") under the Securities Act of 1933 ("Securities Act"), the Securities Exchange Act of 1934 ("Exchange Act") and New York law to recover damages for losses Plaintiffs suffered in connection with their purchases and acquisitions of the common stock of American Realty Capital Properties, Inc. ("American Realty" or the "Company") from May 6, 2013 through October 31, 2014 ("Relevant Period").  Plaintiffs allege the following upon personal knowledge as to their own acts and upon information and belief as to all other matters.  Their information and belief is based on, among other things, the investigation conducted by their counsel.

## I.   INTRODUCTION

1.     This case is about an accounting fraud orchestrated by the top corporate executives of American Realty, which is one of the largest real-estate investment trusts ("REITs") in the world.  Once these executives' fraud and attempted cover-up were brought to light, the Company was forced to restate its prior financials and summarily terminate its top officers, the FBI and the SEC initiated criminal and civil probes, and the Company's stock price plummeted by over 36%, causing Plaintiffs and other investors to lose billions of dollars.

2.     American Realty was founded by Nicholas Schorsch in 2010.  Schorsch took the Company public in September 2011, reaping hundreds of millions of dollars for himself in the process.   Upon going public, American Realty—still controlled by Schorsch—began an acquisition spree, snapping up numerous real-estate companies in an effort to grow its assets and further line Schorsch's pockets.  This unbridled acquisition strategy resulted in American Realty purchasing seven major real-estate companies between February 2013 and July 2014 at an average price of over $7 billion, including rival Cole Real Estate Investment Inc. ("Cole, Inc.") for $11.2 billion.  As a result of these acquisitions, American Realty ballooned from a moderately

sized company with $132 million in assets at year-end 2011 to a real-estate empire with $21.3 billion in assets by mid-2014.

3.     Throughout this growth period, American Realty assured investors that its internal controls were effective and that its financial statements were accurate and could be trusted. Analysts and investors believed these representations, devoting particular attention to the Company's reported "Adjusted Funds From Operations" ("AFFO").  AFFO is a basic financial metric commonly used by investors to evaluate the financial health of a REIT, and is often equated to "earnings per share" for non-REIT companies.   American Realty stressed the importance of its AFFO figure to investors during the Relevant Period, representing that it was pivotal to "assess the sustainability of our operating performance."

4.     Each quarter, American Realty touted its "record" AFFO, which regularly exceeded analysts' estimates and outmatched its competitors.  For example, on May 6, 2013, the first day of the Relevant Period, American Realty reported AFFO of nearly $31 million for the first quarter of 2013, a ***720% increase*** from the prior quarter.  Likewise, on November 7, 2013, American Realty reported AFFO of $47 million for the third quarter of 2013, a ***40% increase*** from the prior quarter.  On February 27, 2014, the Company again reported "record" financial results and fourth quarter AFFO of $56 million, handily beating analysts' estimates and over ***150% greater*** than the corresponding prior-year period.  Finally, on May 8, 2014, the Company reported a record-high AFFO of $147 million for the first quarter of 2014, which was more than ***330% greater*** than what it reported for the same period in 2013.   Analysts and investors applauded the Company for these purportedly exceptional results, calling American Realty "one of the most compelling investment opportunities across the REIT sector."[1]

---

[1] Throughout, all emphasis is added unless otherwise noted.

5.     Unknown to investors, these reported AFFO figures were materially overstated, and the Company's supposed success from its acquisition spree was largely the product of an accounting fiction. American Realty created the illusion that its financial health was superior to what it actually was by misrepresenting its AFFO, as well as the methodology used to calculate it. The Company overstated AFFO by overstating the adjustments that were added back to net income. Although the Company was only supposed to add back adjustments associated with entities it controlled, it improperly added back adjustments associated with non-controlling interests. This error allowed American Realty to materially inflate its AFFO during the Relevant Period, and enabled the Company to continue its acquisition spree with the support of its shareholders and easy access to additional capital.

6.     The Company's former Chief Accounting Officer ("CAO"), Lisa McAlister, has recently filed a complaint in New York state court detailing the Company's accounting fraud. McAlister explained that the improper and undisclosed change to the Company's method for calculating AFFO—from "net" to "gross" basis—was made "***suddenly and without any apparent justification or basis***." The purpose of the change, McAlister admitted, was simple: "***to avoid public disclosure of [American Realty's] faltering financial performance***." This change was not the decision of a rogue low-level employee, but rather was "***ordered***" by CEO Schorsch, himself, and American Realty's former President, David Kay. As McAlister explained, Schorsch instructed Defendant Brian Block, American Realty's former Chief Financial Officer ("CFO"), "***to take steps that would cover up the improper change in accounting***," including by altering American Realty's financial statements in ways that would make it "***more difficult for stockholders to see the fraudulent***" accounting. When McAlister

expressed her concerns to Defendants Schorsch and Kay about these fraudulent practices, she was "*berated*" and "*retaliate[ed]*" against for "*blowing the whistle*."

7.      American Realty's accounting fraud was kept hidden from investors until October 29, 2014. On that date, the Company stunned the market by issuing a press release that disclosed the results of an internal investigation conducted by its Audit Committee. With the assistance of independent counsel and a forensic accountant, the Audit Committee determined that the Company had "*intentionally*" misreported its AFFO figures in various financials issued during the Relevant Period, which had been "*identified*" by the Company's senior management, but "*intentionally not corrected*." The Audit Committee further found that the Company's prior financials needed to be restated and "*should no longer be relied upon*." Finally, the Audit Committee revealed that the Company's internal controls over financial reporting were defective and that its CFO, Defendant Block, and its CAO, Defendant McAlister, had been terminated.

8.      The Company's October 29 revelations decimated the Company's stock price, causing it to plunge by *19%* from the prior day's close, and wiping out over *$2.2 billion* in shareholder market capitalization overnight. Within hours of the Audit Committee's announcement, numerous securities analysts slashed their ratings and cut their price targets for the Company, expressing outrage that American Realty and its executives would engage in such "highly disappointing" misconduct.

9.      Over the next three trading days, the Company's stock price continued to fall as a result of its admitted accounting fraud. On October 29, 2014, *The Wall Street Journal* reported that the SEC had initiated a civil investigation into the Company's accounting improprieties. Shortly thereafter, *Reuters* reported that the FBI and federal prosecutors opened their own probes, which "raise[d] the stakes for the company" by exposing it to potential criminal liability.

On November 3, 2014, RCS Capital Corporation—which had previously agreed to purchase an American Realty subsidiary at a steep premium—cancelled the parties' contract due to the October 29 disclosures.

10.     During the three trading days immediately following American Realty's October 29 revelations, the Company's stock lost over *36%* of its value and the Company's shareholders lost over *$4 billion* in market capitalization, as reflected in the below chart:



11.     Through this action, Plaintiffs assert claims under the Securities Act, Exchange Act, and New York law to recover their substantial losses incurred in connection with their investments in American Realty stock.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, 28 U.S.C. § 1331.

13.     The Court has supplemental jurisdiction over the state law claims asserted pursuant to 28 U.S.C. § 1367(a).

14.     Venue is properly laid in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391.   The acts and conduct described in this Complaint, including the dissemination of false and misleading statements and information, occurred in substantial part in this District.

15.     In connection with these acts, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of a national securities exchange, namely, the NASDAQ stock market ("NASDAQ").

III.    **PARTIES**

     A.    **Plaintiffs**

16.     Plaintiff Twin Securities, Inc. ("Twin Securities") is a Delaware corporation with its principal place of business in New York, New York.

17.     Plaintiff Twin Master Fund, Ltd. ("Twin Master Fund") is an exempted limited company located in Grand Cayman, Cayman Islands.   Twin Securities is the investment advisor for Twin Master Fund.

18.     Plaintiff Twin Opportunities Fund, LP ("Twin Opportunities Fund") is a Delaware limited partnership located in New York, New York.   Twin Securities is the investment advisor for Twin Opportunities Fund.

19.     Plaintiff P Twin, Ltd. ("P Twin") is a limited company located in Tortola, British Virgin Islands.   Twin Securities is the investment advisor for P Twin.

20.     Plaintiff HFR ED Twin Securities Master Trust ("HFR ED Trust") is a trust located in Bermuda.   Twin Securities is the investment advisor for HFR ED Trust.

21.     Twin Securities, Twin Master Fund, Twin Opportunities Fund, P Twin, and HFR ED Trust, are collectively referred to herein as "Plaintiffs."

22.     Plaintiffs purchased or acquired shares of American Realty common stock during the Relevant Period and were damaged thereby.   Plaintiffs purchased or acquired American Realty common stock (i) on the open market; (ii) pursuant or traceable to the Shelf Registration Statement and other Offering Materials related to the May 21, 2014 Stock Offering; and/or (iii) in exchange for shares of common stock of Cole, Inc. pursuant to the terms of the Cole Merger Agreement.

**B.     Defendants**

**1.     American Realty Corporate Defendants**

23.     Defendant American Realty is a Maryland corporation headquartered at 405 Park Avenue, 15th Floor, New York, New York 10022.   American Realty owns and acquires freestanding commercial real estate leased on a medium-term basis pursuant to triple net leases. American Realty is a subsidiary of AR Capital, which is a subsidiary of RCS Capital, the parent company of the Schorsch real-estate investment group. Substantially all of American Realty's business is conducted through its operating partnership, ARC Properties (defined immediately below), of which American Realty is the sole general partner.   The Company's common stock is traded on the NASDAQ.

24.     Defendant ARC Properties Operating Partnership L.P. ("ARC Properties") is a subsidiary, and the operating partnership, of American Realty.   American Realty is ARC Properties' sole general partner.   As of June 30, 2014, American Realty owned 97.3% of the common equity interests in ARC Properties.   ARC Properties is a Delaware limited partnership located at 405 Park Avenue, 15th Floor, New York, New York 10022.

25.     Defendant AR Capital LLC ("AR Capital") is a limited-liability company that purported to provide management and advisory services to American Realty and its affiliates. AR Capital is a subsidiary of RCS Capital and is directly or indirectly owned and controlled by Defendants Schorsch and William Kahane.

26.     Defendant RCS Capital, LLC ("RCS Capital") is an investment and financial services firm.  RCS Capital's subsidiaries include AR Capital.  During the Relevant Period, Defendant Schorsch was the Chairman of RCS Capital.

27.     Defendants American Realty, ARC Properties, AR Capital, and RCS Capital are collectively referred to herein as the "American Realty Corporate Defendants."

**2.     American Realty Executive Defendants**

28.     Defendant Nicholas S. Schorsch ("Schorsch") founded American Realty in 2010 and was its CEO and Chairman during the Relevant Period.  Defendant Schorsch "resigned" as CEO on October 1, 2014, but remained Chairman until December 15, 2014, when he "stepped down" from the Company's Board of Directors following American Realty's October 29, 2014 disclosures.  During the Relevant Period, Defendant Schorsch also was an officer and director at numerous entities related to American Realty.[2] During the Relevant Period, Defendant Schorsch

---

[2]  These include RCS Capital Management, LLC (CEO); RCAP Holdings LLC (Chairman and CEO); American Realty Capital Global Trust, Inc. (Chairman and CEO); American Realty Capital Global Trust, Inc. II (Chairman); AR Capital Acquisition Corp. (Chairman); ARC Properties Advisors, LLC (CEO); American Realty Capital Trust V, Inc. (Chairman and CEO); Corporate Income Properties – ARC, Inc. (President and Director); American Realty Capital Daily Net Asset Value Trust, Inc. (Chairman and CEO); American Realty Capital Healthcare Trust, Inc. (Chairman and CEO); American Realty Capital Healthcare Trust II, Inc. (Chairman); American Realty Capital Healthcare Trust III (Chairman); American Realty Capital Hospitality Trust, Inc. (Chairman); American Realty Capital New York City REIT, Inc. (Chairman and CEO); New York REIT (Chairman and CEO); American Realty Capital – Retail Centers of America II, Inc. (Chairman and CEO); ARC Realty Finance Trust ( Chairman and CEO); American Realty Capital – Retail Centers of America, Inc. (Chairman and CEO); American Realty Capital Trust Advisors, Inc. (Chairman and CEO); AR Capital Acquisition Corp. (Chairman); American Realty Capital Trust IV, Inc. (Chairman and CEO); Cole Corporate Income Trust, Inc. (Chairman, President and CEO); Cole Credit Property Trust, Inc. (Chairman and CEO); Cole Credit Property Trust IV, Inc. (Chairman, President and CEO); Cole Credit Property Trust V, Inc. (Chairman); Cole Office

reviewed, approved, and signed American Realty's false and misleading SEC filings, including the First Quarter 2013 Form 10-Q, the Second Quarter 2013 Form 10-Q, the Third Quarter 2013 Form 10-Q, the 2013 Form 10-K, the First Quarter 2014 Form 10-Q, the Second Quarter 2014 Form 10-Q, and signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 therein ("SOX Certification").  Defendant Schorsch also reviewed, approved and signed the Cole Merger Proxy and the Shelf Registration Statement.  Defendant Schorsch also reviewed and approved false and misleading press releases and signed all of American Realty's Form 8-Ks issued during the Relevant Period.  Defendant Schorsch also participated in conference calls with securities analysts during which American Realty's false and misleading filings with the SEC and its press releases were presented and discussed, including on May 6, 2013, August 6, 2013, November 7, 2013, February 27, 2014 and May 8, 2014.

29.     Defendant Brian S. Block ("Block") was American Realty's CFO and Executive Vice President beginning in December 2010, as well as its Treasurer and Secretary beginning in January 2014.  On October 28, 2014, Defendant Block "resigned" from the Company.  During the Relevant Period, Defendant Block reviewed, approved, and signed American Realty's false and misleading SEC filings, including First Quarter 2013 Form 10-Q, the Second Quarter 2013 Form 10-Q, the Third Quarter 2013 Form 10-Q, the 2013 Form 10-K, the First Quarter 2014 Form 10-Q, the Second Quarter 2014 Form 10-Q, and signed SOX Certifications.  Defendant Block reviewed, approved and signed the Cole Merger Proxy and the Shelf Registration Statement.  Defendant Block also participated in conference calls with securities analysts, during which American Realty's false and misleading filings with the SEC and its press releases were

---

& Industrial REIT, Inc. (Chairman, President and CEO); Cole Real Estate Income Strategy, Inc. (Chairman, President and CEO); Phillips Edison – ARC Grocery Center REIT II (CEO); and Business Development Corporation of America (Chairman and CEO).

presented and discussed, including on May 6, 2013, August 6, 2013, November 7, 2013, February 27, 2014,  May 8, 2014 and July 29, 2014.

30.     Defendant David S. Kay ("Kay") was American Realty's President from December 2013 until October 1, 2014, after which he replaced Defendant Schorsch as the Company's CEO and joined the Company's Board of Directors.   On December 15, 2014, American Realty announced that Defendant Kay "stepped down" as the Company's CEO and as a member of its Board of Directors.   During the Relevant Period, Defendant Kay reviewed, approved, and signed American Realty's false and misleading SEC filings, including the 2013 Form 10-K and the Cole Merger Proxy.   Defendant Kay also participated in conference calls with securities analysts, during which American Realty's false and misleading filings with the SEC and its press releases were presented and discussed, including on February 27, 2014, May 8, 2014 and July 29, 2014.

31.     Defendant Lisa P. McAlister ("McAlister") was American Realty's Senior Vice President and Chief Accounting Officer from November 4, 2013 through October 28, 2014, when she was terminated.   During the Relevant Period, Defendant McAlister reviewed, approved, and signed American Realty's false and misleading SEC filings, including the 2013 Form 10-K and the Second Quarter 2014 Form 10-Q.

32.     Defendants Schorsch, Kay, Block, and McAlister are collectively referred to herein as the "American Realty Executive Defendants."

### 3.      American Realty Director Defendants

33.     Defendant William M. Kahane ("Kahane") was a member of American Realty's Board of Directors from February 2013 until June 24, 2014.

34.     Defendant Leslie D. Michelson ("Michelson") was a member of American

Realty's Board of Directors during the Relevant Period.

35.     Defendant William G. Stanley ("Stanley") was a member of American Realty's Board of Directors from January 2014 through the end of the Relevant Period.

36.     Defendant Edward G. Rendell ("Rendell") was a member of American Realty's Board of Directors throughout the Relevant Period.

37.     Defendant Scott J. Bowman ("Bowman") was a member of American Realty's Board of Directors during the Relevant Period until September 9, 2014.

38.     Defendant Thomas A. Andruskevich ("Andruskevich") was a member of Cole, Inc.'s Board of Directors and, upon the completion of the Cole Merger in February 2014, became a member of American Realty's Board of Directors.

39.     Defendant Scott P. Sealy, Sr. ("Sealy") was a member of Cole, Inc.'s Board of Directors and, upon the completion of the Cole Merger in February 2014, became a member of American Realty's Board of Directors.  Sealy resigned effective June 10, 2014.

40.     Defendants Kahane, Michelson, Stanley, Rendell, Bowman, Andruskevich and Sealy are collectively referred to herein as the "American Realty Director Defendants." During the Relevant Period, Michelson, Stanley, Rendell, Bowman, Andruskevich and Sealy reviewed, approved, and signed American Realty's false and misleading 2013 Form 10-K.   During the Relevant Period, Defendants Kahane, Rendell, Michelson and Bowman signed American Realty's false and misleading Shelf Registration Statement.

### 4.     Cole Defendants

41.     Defendant Cole, Inc. is a Maryland corporation.  On February 7, 2014, Cole, Inc. merged with American Realty and became a wholly owned subsidiary of American Realty.

42.     Defendant Christopher H. Cole ("Cole") was Cole, Inc.'s Executive Chairman of the Board from April 5, 2013 until the completion of the Cole Merger.

43.     Defendant Marc T. Nemer ("Nemer") was Cole, Inc.'s CEO from April 5, 2013 until the closing of the Cole Merger.

44.     Defendant Jeffrey C. Holland ("Holland") was Cole, Inc.'s President and COO from June 3, 2013 until the closing of the Cole Merger.

45.     Defendant Stephan Keller ("Keller") was Cole, Inc.'s Executive Vice President, CFO and Treasurer from June 3, 2013 until the closing of the Cole Merger.

46.     Defendant D. Kirk McAllaster, Jr. ("McAllaster") was Cole, Inc.'s Executive Vice President from April 5, 2013 until the closing of the Cole Merger.

47.     Defendant Leonard W. Wood ("Wood") was a member of Cole, Inc.'s Board of Directors from April 5, 2013 until the closing of the Cole Merger.

48.     Defendants Cole, Nemer, Holland, Keller, McAllaster, Wood, Sealy and Andruskevich are collectively referred to as the "Cole Executive and Director Defendants" and, with Cole, Inc., the "Cole Defendants." The Cole Executive and Director Defendants reviewed, approved, and signed the false and misleading Cole Merger Proxy.

### 5.     Auditor Defendant

49.     Defendant Grant Thornton LLP ("Grant Thornton") is an accounting firm that provided American Realty with audit and tax advice before and during the Relevant Period. During the Relevant Period, Defendant Grant Thornton issued a materially false and misleading audit report that certified American Realty's false and misleading financial statements included in the Company's 2013 Form 10-K.

## IV.   SUMMARY OF THE CASE

### A.   Defendant Schorsch's REIT Empire

50.   American Realty's founder, Defendant Schorsch, entered the commercial real-estate business in 1998.  In 2006, Defendant Schorsch—who has been characterized by *Forbes* as a "hard-charging, fast-talking real estate chief"—devised a way to accumulate substantial personal wealth.  His strategy consisted of obtaining funds from investors to finance a complex web of interrelated companies, including non-traded REITs, public REITs, research and advisory firms and management companies.  He raised money for his non-traded REITs, took them public, and then used those vehicles to buy out other non-traded REITs.   Through his vertically integrated real-estate empire, he collected hundreds of millions of dollars through profit-sharing arrangements, director fees, and hidden compensation for "research and advisory services" that he provided to his related entities.

51.   In 2010, Defendant Schorsch founded American Realty, one of his many related entities, and appointed himself Chairman and CEO.  Schorsch took American Realty public in September 2011 and listed the Company on the NASDAQ exchange.  American Realty owned and acquired single-tenant, freestanding commercial real estate properties subject to "net leases." In a net lease, the tenant pays the expenses that are traditionally borne by the landlord, such as building maintenance expenses, property taxes, and insurance.   These lease arrangements allowed American Realty to distribute the rent received from its properties, less certain fees, to its shareholders as "dividends."   American Realty's tenants included many prominent commercial lessees such as Red Lobster, Walgreens, CVS, Dollar General, FedEx, Family Dollar, GSA, Albertson's, Citizens Bank, and AT&T.

52.   After taking American Realty public, Schorsch kept the Company part of his close-knit network of real-estate companies.  American Realty remained a subsidiary of AR

Capital, which itself is a subsidiary of RCS Capital, the parent entity of Schorsch's real-estate group.  Schorsch also ensured that he maintained complete control over American Realty's business by conducting the Company's daily operations through its operating partnership, ARC Properties.  As reflected in the graphic below, these entities were part of an even more complex network of companies that Defendant Schorsch owned and controlled during the Relevant Period.



53.    Defendant Schorsch maintained control over his real-estate network by occupying executive leadership positions at each one of his interrelated entities.  Until recently, Defendant Schorsch was the Chairman and, in some cases, CEO and President of all of his numerous related real-estate companies, including American Realty.  These companies had overlapping boards of directors and executives, all of whom ultimately reported to Defendant Schorsch, as reflected in the below chart.



The many roles of Nicholas Schorsch

| Company | Position |
|---------|----------|
| American Realty Capital - Retail Centers of America Inc. | Chairman and CEO |
| American Realty Capital Daily Net Asset Value Trust Inc. | Chairman and CEO |
| American Realty Capital Global Trust II Inc. | Chairman and CEO |
| American Realty Capital New York City REIT Inc. | Chairman and CEO |
| ARC Realty Finance Trust Inc. | Chairman and CEO |
| American Realty Capital Trust V Inc. | Chairman and CEO |
| American Realty Capital - Retail Centers of America II Inc. | Chairman, treasurer and CEO |
| Business Development Corp. of America | Chairman and CEO |
| Business Development Corp. of America II | Chairman and CEO |
| Cole Corporate Income Trust Inc. | Chairman, president and CEO |
| Cole Credit Property Trust IV Inc. | Chairman, president and CEO |
| Cole Credit Property Trust V Inc. | Chairman, president and CEO |
| Cole Office & Industrial REIT Inc. | Chairman, president and CEO |
| Cole Real Estate Income Strategy (Daily NAV), Inc. | Chairman, president and CEO |
| New York REIT Inc. | Chairman and CEO |
| American Realty Capital Global Trust Inc. | Chairman |
| American Realty Capital Healthcare Trust II Inc. | Chairman |
| American Realty Capital Healthcare Trust III Inc. | Chairman |
| American Realty Capital Healthcare Trust Inc. | Chairman |
| American Realty Capital Hospitality Trust, Inc. | Chairman |
| American Realty Capital Properties Inc. | Chairman |
| RCS Capital Corp. | Chairman |

54.     Through this elaborate web of corporate arrangements, Defendant Schorsch directly and indirectly controlled the accounting for each of his entities, including American Realty.  He also made certain that he profited personally from their operations.  Throughout the Relevant Period, Schorsch engaged in self-dealing—described to investors as "services"— through which Schorsch reaped hundreds-of-millions of dollars in the form of compensation and fees.

**B.     The Significance And Importance Of "Adjusted Funds From Operations"**

55.     In evaluating American Realty's stock, investors largely focused on the Company's AFFO, which typically provides REIT investors with an important metric to measure anticipated "dividend" payments.  The Company stated in its financial statements filed with the SEC that it calculated AFFO by first determining its funds from operations ("FFO") and then excluding certain balance sheet line items, including acquisition-related fees and expenses, deferred financing costs, non-cash mark-to-market adjustments, and non-cash compensation.

56.     American Realty repeatedly stressed to investors the importance of its reported AFFO throughout the Relevant Period.  In its SEC filings, proxy materials, press releases,

presentations, and conference calls, the Company represented that its reported AFFO allowed

investors to evaluate the sustainability of American Realty's long-term operating performance

and to compare American Realty's performance with other companies, many of which did not

have the Company's level of merger and acquisition activity.   For example, in its 2013 Form

10-K, American Realty stated that:

> By providing AFFO, we believe we are presenting useful information that assists
> investors and analysts to better assess the sustainability of our ongoing operating
> performance without the impacts of transactions that are not related to the
> ongoing profitability of our portfolio of properties.   We also believe that AFFO is
> a recognized measure of sustainable operating performance by the REIT industry.
> Further, we believe AFFO is useful in comparing the sustainability of our
> operating performance with the sustainability of the operating performance of
> other real estate companies that are not as involved in activities which are
> excluded from our calculation.

57.     All of the Company's SEC filings during the Relevant Period reported the

Company's purported AFFO, with each of them including a table that supposedly described

precisely how the Company calculated its AFFO each quarter.   Importantly, American Realty

represented in these filings that it calculated AFFO on a "***net basis***."   Under this method, only net

income and adjustments associated with American Realty's equity interest in the Operating

Partnership were supposed to be considered in calculating AFFO.   Because American Realty held

96.5% of the equity interest in the Operating Partnership during the Relevant Period, the

Company was permitted to "add back" only 96.5% of costs when calculating AFFO.

58.     Throughout the Relevant Period, American Realty issued press releases and

financial statements that reported "record" AFFO.   Moreover, the Company's AFFO each quarter

regularly beat its competitors and exceeded analysts' estimates.   On May 6, 2013, the first day of

the Relevant Period, American Realty reported AFFO for the first quarter of 2013 of nearly $31

million, which was 720% greater than the prior quarter.   Then, in the third quarter of 2013,

American Realty reported AFFO of $47 million, which was a 40% increase from the prior quarter.  On February 27, 2014, the Company again reported "record" financial results and fourth quarter AFFO of $56 million, which was over 150% more than the AFFO from the corresponding prior year period.  Lastly, on May 8, 2014, the Company reported a record-high AFFO of $147 million for the second quarter of 2014, which was more than 330% greater than what it reported for the same period in 2013.

59.     Analysts relied heavily on the Company's reported AFFO in evaluating American Realty's financial condition and stock price.  For example, Barclays Capital, the Company's financial advisor, assessed the value of American Realty by "calculat[ing] and analyz[ing the] ratio of its current stock price to its calendar year 2014 estimated AFFO based on Wall Street research consensus estimates."  Research analysts at Ladenburg Thalmann, BMO Capital Markets, and JMP Securities similarly evaluated American Realty's stock on a price-to-AFFO basis.  In one analyst report, for example, JMP Securities concluded that American Realty's price-to-AFFO multiple of 11-times AFFO—in comparison to its peer group, which had an average price-to-AFFO multiple of 15-times—made American Realty a "must own" stock.

60.     Unknown to investors at the time, the Company's reported AFFO was not a reliable metric to assess American Realty's true value, the sustainability of its operating performance, or its performance relative to its competitors.  The Company's reported AFFO, in fact, provided an inaccurate picture of its financial condition that bore little resemblance to its true financial condition and misled investors into believing that American Realty was an attractive REIT to own.

### C.   American Realty's Campaign To Rapidly
### Grow Through Mergers And Acquisitions

61.     By reporting favorable AFFO results, American Realty was able to secure capital infusions and garner investor support necessary to allow American Realty to go forward with its stated goal: to convert the Company into an "acquisition machine."

62.     Schorsch succeeded in his efforts.  In just three years, American Realty grew into one of the largest REITs in the country, with over $21.3 billion in assets—nearly ***200-times*** larger than when the Company went public.  This rapid expansion was the product of an aggressive merger-and-acquisition campaign, which American Realty was only able to accomplish through the sale to investors of billions of dollars of additional equity and debt securities.  The Company's recent acquisitions included:

- The acquisition of ARCT III on February 28, 2013 for $2.2 billion;
- The acquisition of GE Capital Properties on June 28, 2013 for $774 million;
- The acquisition of CapLease, Inc. on November 5, 2013 for $2.2 billion;
- The acquisition of ARCT IV on January 3, 2014 for $3 billion;
- The acquisition of Fortress Group Properties on January 8, 2014 for $601 million;
- The acquisition of Cole, Inc. on February 7, 2014 for $11.2 billion; and
- The acquisition of Red Lobster properties on July 28, 2014 for $1.5 billion.

63.     Throughout American Realty's acquisition spree, Defendants represented that each transaction was favorable to shareholders, added value to the Company, and increased the Company's AFFO.  For example, in connection with the CapLease Merger, Defendant Schorsch announced that "[t]he acquisition is expected to result in approximately 11% accretion to our AFFO in 2014" and that American Realty expected "to add $0.11 per share to our AFFO" as a result of the acquisition.  Similarly, in connection with the ARCT IV Merger, the Company announced an increase in AFFO estimates "equivalent to approximately 31% growth over 2013[] AFFO per share."   Defendants further represented in connection with these purchases that the

Company had the internal controls necessary to properly account for its acquisition activity and had a solid understanding of its financial condition.

64.     American Realty's largest and most prominent merger during the Relevant Period was with Cole, Inc. ("Cole Merger").   On October 22, 2013, American Realty and Cole, Inc. entered into an Agreement and Plan of Merger ("Cole Merger Agreement"), which provided that Cole, Inc. shareholders, including Plaintiffs, would receive 1.0929 shares of American Realty common stock or $13.82 for each Cole, Inc. share.

65.     Defendants repeatedly represented to investors that the Cole Merger was beneficial to Cole, Inc. and American Realty shareholders, urging Cole, Inc.'s shareholders to approve the merger and exchange their shares.   In SEC filings filed in connection with the Cole Merger, American Realty and the Cole Defendants highlighted how the merger would result in "AFFO Growth."   In a press release accompanying the Cole Merger, Defendant Schorsch stated that American Realty was the "new industry leader" and committed to "drive value for stockholders by placing their interests ahead of our own, aligning pay with performance, and reporting fully and transparently."   Schorsch further represented that the Cole Merger would enable American Realty to "deliver AFFO per share earnings accretion through further cost of capital advantages" and "improve our AFFO multiple."   On a conference call with analysts and investors days later, Defendant Schorsch again touted the Cole Merger as "an epic transaction" and a "win-win to the shareholders."   Defendant Block reiterated this point, telling investors that the Company's AFFO after the merger would be "$1.13 to $1.19 per share."

66.     On November 5, 2013, Defendants filed with the SEC a registration statement on Form S-4/A related to the Cole Merger ("Cole Registration Statement").   On December 23, 2013, the Company also filed with the SEC a Joint Proxy Statement/Prospectus to Cole, Inc.

shareholders ("Cole Merger Proxy").  The Cole Registration Statement and Cole Merger Proxy made numerous representations to investors regarding the Cole Merger, including the financial data for American Realty for the first nine months ended September 30, 2013.  The materials represented that the "unaudited financial statements include all adjustments (consisting of normal recurring adjustments) necessary for a fair presentation of the interim September 30, 2013 financial information."

67.    Additionally, the Cole Merger Agreement—which was attached to both the Cole Registration Statement and the Cole Merger Proxy and was incorporated by reference in both documents—represented that American Realty's SEC filings and the financial data within those filings were free of material misstatements and omissions.  They further represented that American Realty had a system of internal accounting controls that was effective, reliable and sufficient to ensure that American Realty's financial statements were accurate.  Among other things, they assured investors that American Realty and its executives had "devised and maintain a system of internal accounting controls sufficient to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP."

68.    The Cole Merger closed on February 7, 2014.  Plaintiffs, along with other investors, voted in favor of the Cole Merger and exchanged their Cole, Inc. shares for American Realty shares.  Unknown to Cole, Inc. shareholders deciding whether to cast their shareholder vote in favor of the Cole Merger, American Realty's financial performance was "faltering," it was overstating its AFFO by material amounts, and it lacked the represented financial controls necessary to ensure its disclosures were truthful and complete.

**D.** **American Realty's Acquisition Binge Was Highly Profitable**
**For Defendant Schorsch's Empire And American Realty's Executives**

69.     American Realty's dramatic growth, including through the Cole Merger, generated hundreds of millions of dollars in transactional fees and "performance-related" compensation payments for Defendant Schorsch and his entities.  For example, in connection with the ARCT IV Merger, Schorsch's entities received approximately $25 million for various services, with Realty Capital Securities, LLC, alone, recording $15.32 million in fees for "financial advisory and strategic services."   In connection with the Cole Merger, Schorsch's entities again obtained a $32 million payout, including $28 million to RCS for "financial advisory and strategic services"; $2.9 million to RCS Advisory Services, LLC for "transaction management services"; and $750,000 to RCS and RCS Advisory Services, LLC together for their "[r]etention as non-exclusive advisor and information agent."

70.     The Company's executives also personally profited from American Realty's acquisition binge.  Over intense shareholder objection, the Company adopted a 2014 Multi-Year Outperformance Plan ("OPP"), which tied executive compensation to the Company's size and reported AFFO.   When the Company's stock price rose as it acquired more companies and recorded higher AFFO, the Company's executives profited.  In total, the proposed OPP provided an executive-incentive compensation pool of $222.1 million for 2014, with 42.5% of the pool allocated to Defendant Schorsch.  This incentive compensation was in addition to: (i) Defendant Schorsch's base salary of $1.1 million for 2014; (ii) an estimated $8.8 million of nonguaranteed cash bonus and equity awards; and (iii) a "retention grant" worth $24.9 million.  American Realty adopted the OPP, notwithstanding a 67.6% non-binding shareholder vote *rejecting* the OPP and a May 16, 2014 Institutional Investor Services ("ISS") report criticizing the plan. As the ISS explained, the OPP plan was not "rigorous relative to the potential payout values."

American Realty nevertheless adopted the OPP, with a recently disclosed December 12, 2014 agreement between Schorsch and the Company revealing an "Award Agreement dated January 8, 2014, under the American Realty 2014 Multi-Year Outperformance Plan." Through this OPP— as well as various other forms of compensation, director fees, and profit arrangements that accompanied each acquisition—the American Realty Executive Defendants personally profited from their fraud.

### E.   American Realty Rebukes Doubters And Assures Investors That The Company's Internal Controls Are Effective and Functioning Properly

71.   Throughout the Relevant Period, American Realty told investors that its internal controls were effective and functioning properly, and that its financial statements were accurate. Each of its financial statements filed with the SEC during the Relevant Period contained representations that Defendants Schorsch and Block personally "evaluated" and determined that "the [Company's] disclosure controls and procedures are effective." Defendants Schorsch and Block also signed SOX Certifications that were included in each financial statement. These Certifications affirmed the purported accuracy of American Realty's financial statements, and also assured investors that Defendants Schorsch and Block had designed and implemented internal controls over financial reporting necessary to ensure that American Realty's financials were reliable and complied with GAAP.

72.   The American Realty Executive Defendants continued to make representations about the soundness of the Company's internal controls over financial reporting, notwithstanding investor scrutiny and mounting evidence of serious deficiencies. By way of example, on May 19, 2014, American Realty filed a Form 8-K that included inaccurate pro forma financials for the spin-off of its multi-tenant shopping center business. The Company was forced to admit the misstatements shortly thereafter, acknowledging that American Realty's published financial

statements included an inaccurate weighted share count, which had the effect of boosting the Company's earnings by approximately *30%*.  Only days later, American Realty refiled a preliminary prospectus supplement with the SEC relating to its May 2014 Offering, which the Company admitted had misstated closing costs and expenses by nearly *$100 million*.

73.    When investors voiced concerns about these lapses, American Realty's executives assured them that they were isolated instances and that investors should be confident in the accuracy of the Company's reported financials and the integrity of its controls.  For example, on June 2, 2014, Marcato Capital Management LP, one of the Company's largest shareholders, sent a letter to American Realty questioning the effectiveness of the Company's financial controls following its rapid acquisitions.  The letter expressed concern that "the Company itself seemingly cannot keep its own financials straight" and criticized the Company's "disorderly financial controls exposed by [its] second material disclosure error in as many weeks." American Realty responded to these concerns with a series of letters to the Company's shareholders, as well as SEC filings that continued to represent to investors that the Company's financials were accurate, that the Company was committed to sound corporate governance, and that there were no flaws in any internal controls.  Unfortunately, none of this was true.  As shareholders ultimately learned, Defendant Schorsch was not committed to correcting the weaknesses in the Company's financial and reporting controls; rather, he was devoted to making the Company's financials appear as strong as possible, even if that required fabricating its most critical and closely watched financial metric.

F.    **Unknown To Investors At The Time, American Realty Intentionally Misstates The Company's AFFO**

74.    When calculating AFFO, a company is allowed to "add back" certain transaction and financing costs not associated with operations.  When a company has a fractional ownership

interest in an operating partnership, however, it is only allowed to "add back" its *pro rata* share of the operating partnership's transaction and financing costs.  This is known as calculating AFFO on a "net" basis.  This method of calculation differs from a "gross" basis calculation. When AFFO is calculated on a "gross" basis, the company reports income associated with the entirety of an operating partnership and "adds back" the entirety of the transaction and financing costs.

75.     As discussed above, American Realty specifically represented to investors in its SEC filings that it calculated AFFO on a "net" basis—***not*** a "gross" basis.  Unknown to investors until recently, these representations were false.  In a December 18, 2014 verified complaint, American Realty's former CAO, Defendant McAlister, explained that the Company improperly began calculating AFFO on a gross basis—rather than a net basis—"in the fourth quarter of 2013 ('2013 Q4'), and possibly in earlier quarters."  This change, McAlister admitted, was made "***suddenly and without any apparent justification or basi***s."  Through this change, the Company began improperly "add[ing] to and increas[ing] the Company's AFFO by the entirety of the added-back costs, including the portion thereof that should have been attributed to non-controlling interests in the operating partnership."   In so doing, the Company materially overstated its AFFO and provided investors with a distorted picture of the Company's financial condition and the supposed benefits of the Company's numerous acquisitions.

76.     American Realty changed its AFFO, McAlister explained, to mask the true facts about its financial condition, which were unknown to investors at the time.  Contrary to its repeated claims of "record" AFFO and successful acquisitions, the Company's financial performance was ***"faltering"*** during the Relevant Period and its acquisitions were a negative

drain on its bottom line. The Company's accounting improprieties, as McAlister has admitted, were necessary "*to avoid public disclosure of the Company's faltering financial performance*."

77.     American Realty's top executives were fully aware of, and participated in, the Company's fraudulent accounting.  As set forth in McAlister's verified complaint, when she alerted the Company's former CEO, Defendant Kay, to the Company's improper accounting of AFFO, he directed her and Defendant Block "*not to change or correct the fraudulent reports*." Defendant Schorsch similarly instructed Defendants Block and McAlister not to correct the Company's fraudulent financials.  As McAlister recounted, on or about July 28, 2014, Defendant Schorsch "*directed Mr. Block [during a telephonic conference call] to conceal the previous improper reporting*."

78.     The Company perpetuated its accounting fraud by devising ways to conceal it from investors.  According to McAlister, Defendant Schorsch instructed CFO Block "*to take steps to cover up the improper change in accounting and unlawfully misleading financial reports*."  Defendants Schorsch and Kay also directed Block and McAlister to "change[] the beginning point for its AFFO calculation from 'net loss attributable to stockholders (in accordance with U.S. GAAP)' to 'net loss (in accordance with U.S. GAAP).'"  The goal of these changes, McAlister has revealed, was to "*ma[k]e it more difficult for stockholders to see the fraudulent change in the add-backs of non-recurring transaction and deferred financing costs*."

79.     American Realty and its top executives also threatened, intimidated, and terminated employees who attempted to interfere with the Company's fraud.  Defendant McAlister has explained how she "repeatedly expressed her concerns regarding Mr. Schorsch's instruction to shift and reallocate the funds in the 2014 Q2 report."  When these issues were

raised, however, "members of senior management either ignored Ms. McAlister's concerns regarding erroneous accounting practices, or berated Ms. McAlister for calling attention to them." Indeed, shortly after "blowing the whistle," McAlister was "retaliate[ed]" against and terminated as the "scapegoat."

80.     The Company's fraudulent accounting was also known by the Company's long-time auditor, Grant Thornton. Before the deadline to file the Company's second quarter 2014 financials, Defendant McAlister emailed Jessica Estrada, a Manager at Grant Thornton, and "called attention to the manipulative accounting practice." Ms. Estrada and Richard LeFleur, a Partner at Grant Thornton, disregarded her concerns, approved the accounting improprieties and authorized the Company's filing of the false and misleading financials.

### G.     American Realty's Audit Committee Discloses That Its Top Officers Intentionally Misrepresented The Company's AFFO

81.     Investors began to learn the true facts about American Realty's accounting fraud on October 29, 2014. That morning, American Realty issued a press release that contained a series of startling admissions. The press release revealed for the first time that the Company's Audit Committee had conducted "an investigation into concerns regarding accounting practices and other matters." Based on its investigation, the Audit Committee concluded that the Company's previously issued financials "*should no longer be relied upon*," including its financial statements for 2013 and the first and second quarters of 2014.

82.     The Audit Committee retained independent counsel and forensic experts to conduct the investigation. Through their investigation, the Audit Committee determined that the Company "incorrectly included certain amounts related to its non-controlling interests in the calculation of AFFO" and, as a result, overstated AFFO. The Audit Committee further found that "[1] this error was *identified but intentionally not corrected*, and [2] other AFFO and financial

statement errors were ***intentionally made***, resulting in an overstatement of AFFO and an understatement of the Company's net loss for the three and six months ended June 30, 2014."

83.     The Audit Committee also revealed that the Company's CAO, Defendant McAlister, and CFO, Defendant Block, were terminated.  These officers, the Audit Committee made clear, were implicated and responsible, at least in part, for the Company's accounting fraud.  Indeed, because of these Defendants' "key roles in the preparation of [the fraudulent] financial statements," the Audit Committee concluded that the Company's earlier financials prepared by these Defendants merited additional review and should not be relied upon.  The Audit Committee cautioned that the Company's upcoming review—which is still not complete—"***could identify further adjustments in addition to those discussed above***."

84.     The Company's Audit Committee further found that American Realty's internal controls over financial reporting were materially deficient.  On this subject, the Audit Committee explained that "the Company is reevaluating its internal control over financial reporting and its disclosure controls and procedures" and "intends to make the necessary changes to its control environment to remediate all control deficiencies that are identified as a result of the ongoing investigation and the restatement process."

85.     After issuing its press release on October 29, 2014, American Realty held a conference call with investors to discuss the Company's revelations.  During the call, Defendant Kay adopted and repeated the Audit Committee's findings set forth in the Company's press release.  He explained how, on September 7, 2014, an American Realty employee contacted the Audit Committee and reported accounting improprieties.  He further explained that, for the first quarter of 2014, AFFO was supposed to be calculated on a "net" basis, with any adjustments to net loss multiplied by approximately 96.5% to reflect American Realty's interest in the Operating

Partnership.   As Defendant Kay admitted, however, American Realty improperly calculated AFFO on a "gross" basis during the first quarter of 2014, making adjustments to net loss based on the full results of the Operating Partnership.   As a result, American Realty added back more adjustments than it should have, which resulted in an improperly inflated AFFO.   Defendant Kay further admitted that the Company's fraudulent accounting improperly increased AFFO for the first quarter of 2014 by $17.6 million, artificially inflating AFFO to $0.26 per share when it should have been only $0.23 per share.   The Company again fraudulently manipulated its financials in the second quarter of 2014 by, among other things, moving approximately $10.5 million of second quarter 2014 expenses to the third quarter of 2014 to "***conceal the error from the [prior] quarter***."   In so doing, the Company reported an artificially low net loss for the second quarter of 2014.  As Defendant Kay acknowledged, "***we had some bad judgment there***." Defendant Kay also attempted to assure the market that the Company had the issue under control and that "[n]one of the executives that are currently at the Company have been implicated during the investigation related to the concealment of that error."

86.   Analysts were stunned by the Company's October 29, 2014 disclosures.  Wells Fargo Securities reported that "this morning's announcement will be a significant setback for the company in terms of earning or maintaining investor trust, credibility, and allaying investor skepticism."   JMP Securities similarly concluded that an "Accounting Fraud [had been] uncovered," and that "management's credibility, which was already under scrutiny, took a further impairment."   Analysts at JPMorgan Securities further concluded that, as a result of the revelation of the accounting fraud, "[American Realty]'s credibility is likely impugned for some period of time," and "capital costs will be higher in the near term … thus making growth more difficult."  Commentator Jim Cramer remarked that, when he read the Company's disclosure, his

"heart jump[ed] out of [his] throat" because the October 29 disclosure made clear that American Realty's senior executives "knew and did nothing" to correct the Company's misstatements.

87.     Credit rating agencies also responded swiftly to the Company's disclosures. Within hours of the news, S&P placed American Realty's debt rating on downgrade "watch." Moody's also placed the Company's corporate debt rating under review, explaining that the "purposeful hiding of the accounting error engenders questions about the company's credibility and maintenance of investor trust."

88.     Federal and state regulators also responded to the Company's revelations.  After the close of trading on October 29, 2014, *The Wall Street Journal* reported that the SEC "intends to launch an inquiry into the accounting irregularities" at American Realty.  As *The Wall Street Journal* explained, "the revelation is a black eye for Mr. Schorsch, chairman of American Realty Capital and one of the biggest real-estate investors in the U.S."  The following day, analysts at Ladenburg Thalmann stated that the revelations were "highly disappointing" and noted that, per *The Wall Street Journal* article, "More shoes could drop as probe could find additional issues and more agencies get involved."  Indeed, on October 31, 2014, *Reuters* reported that the FBI and the U.S. Attorney's Office for the Southern District of New York had now "opened a criminal probe of [American Realty] in the wake of the real estate investment trust's disclosure that it had uncovered accounting errors."

89.     The Company's revelations and accounting fraud severely impacted its business operations.  On November 3, 2014, American Realty announced that RCS Capital had terminated its $700 million agreement to purchase an American Realty subsidiary, Cole Capital.   In terminating the agreement, RCS Capital cited the "recent disclosures by [American Realty] on October 29, 2014, and the matters arising with respect to such disclosures."

90.     The Company's October 29, 2014 revelations caused the price of American Realty's stock to decline markedly.   On the day of the press release, American Realty's stock price dropped from $12.38 to $10.00, a decline of more than *19%*, on extremely high trading volume of 231 million shares.   The stock price fell by an additional *17%* during the next three trading days, as more revelations were made and the impact of the accounting fraud was further disclosed and appreciated by investors.   In total, the Company's disclosures caused the Company's stock price to fall by over *36%* in only three trading days, erasing over *$4 billion* in market capitalization.

**H.      Defendants Schorsch And Kay Unexpectedly "Resign"**

91.     The impacts of the Company's accounting fraud continue to be felt.   The Company committed to restate its financials by November 2014, but failed to do so.  This failure prompted the NASDAQ to issue a notice admonishing the Company that it was "not in compliance with NASDAQ Listing Rule 5250(c)(1) that requires timely filing of reports with the [SEC]."  Notwithstanding the NASDAQ's warning, the Company—over three months later—has still not restated its financials.  Instead, the Company's "investigation" into the fraud continues.

92.     On December 15, 2014, the Company announced that its founder, Defendant Schorsch, its CEO, Defendant Kay, and its COO, Lisa Beeson, had all "resigned," effective immediately.  The press release announcing these unexpected "resignations," made clear that the Company's Board of Directors wants no further dealings with these culpable executives.   In announcing their unexpected departures, the Company's press release explained that these long-time American Realty executives were immediately relieved from their "employment or board positions held with the Company, its subsidiaries and certain Company-related entities."   The press release further assured investors that, "[i]n connection with Mr. Schorsch's departure as

Executive Chairman, American Realty will be unwinding all of its relationships with entities in which Mr. Schorsch maintains an executive or director-level role or is a significant stockholder."

## V.      ADDITIONAL ALLEGATIONS OF SCIENTER

93.      Defendants American Realty, ARC Properties, Schorsch, Kay, Block, McAlister, and Grant Thornton acted with scienter with respect to the materially false and misleading statements and omissions discussed herein.

94.      American Realty has admitted that the Company acted with scienter when it issued false and misleading financials.  As discussed above at ¶¶7, 81, the Company's October 29, 2014 press release stated that its executives had "identified" misstatements in the Company's financials, but nevertheless "intentionally" did not correct them.  The Company has further admitted that the misstatements in its financials during the second quarter of 2014 were "intentionally made" and deliberately concealed from investors.  In addition, the Company has recognized that its internal controls over financial reporting were materially deficient—a fact which the Company and its top officers knew or were severely reckless in not knowing.  Indeed as discussed above at ¶¶82-85, the Company had already identified multiple errors in its financials, and Schorsch and his entities had been improperly using his network of related entities to complete various self-dealing transactions.

95.      Defendant Schorsch was American Realty's founder, CEO, and Chairman and, as such, was intimately familiar with, and exercised substantial control over, every aspect of American Realty's business, including its calculation and reporting of AFFO and the effectiveness of the Company's internal controls over financial reporting.  As discussed herein, Defendant Schorsch directed American Realty's CFO, Defendant Block, to improperly report the Company's AFFO.  Defendant Schorsch also directed Defendant Block and others to conceal the Company's improper accounting by fraudulently deferring the accrual of second quarter

31

expenses.   Knowing these facts, Defendant Schorsch nevertheless certified the accuracy of American Realty's financial results and the adequacy of its internal controls in American Realty's financial filings throughout the Relevant Period.   Defendant Schorsch's scienter is further demonstrated by the decision of American Realty's independent directors on or about December 15, 2014 to sever all ties between American Realty and Defendant Schorsch and ask him to "step down."

96.   Defendant Block was American Realty's CFO, and, as such, had ultimate responsibility for American Realty's finances.   In addition, Defendant Block was intimately familiar with, and exercised substantial control over, American Realty's business, including its calculation and reporting of AFFO and the effectiveness of its internal controls over financial reporting.   As discussed herein, Defendant Block became aware by no later than February 2014 that American Realty's financial statements contained errors related to the calculation of AFFO, yet he did nothing to correct those errors.   In fact, Defendant Block continued to certify the accuracy of American Realty's financial statements, as well as the adequacy of American Realty's internal controls throughout the Relevant Period, despite knowing that the Company's financial statements did not accurately reflect the Company's true financial condition.   In addition, as discussed above at ¶6, Defendant Block attempted to conceal the Company's improper accounting by converting to the "gross" method of reporting AFFO and fraudulently deferring the accrual of second quarter expenses. As the Audit Committee explained in its October 29, 2014 disclosure, Block had a "key role[] in the preparation" of the fraudulent reports, which led to his immediate termination and necessitated a review of prior financial statements that he approved.

97. Defendant McAlister was American Realty's CAO, was a member of American Realty's senior management, and was in charge of American Realty's accounting. As Defendant McAlister admitted in her verified complaint, by no later than February 2014, she knew that American Realty's financial statements contained errors related to the calculation of AFFO, yet she failed to correct those errors. Defendant McAlister also was fully aware that Defendant Schorsch directed Defendant Block to conceal the improper accounting by converting to the "gross" method of reporting AFFO and fraudulently deferring the accrual of second quarter expenses. Defendant McAlister nevertheless signed the Second Quarter 2014 Form 10-Q despite knowing of the fraudulent accounting contained in the Company's financials. As the Audit Committee explained in its October 29, 2014 disclosure, McAlister had a "key role[] in the preparation" of the fraudulent reports, which led to her immediate termination and necessitated a review of prior financial statements that she approved.

98. As American Realty's President and CEO, Defendant Kay was a member of American Realty's senior management, was responsible for the Company's day-to-day operations, and was familiar with American Realty's internal controls. As discussed herein, Defendants Block and McAlister brought the improper AFFO accounting to Defendant Kay's attention by no later than February 2014. In response, however, "Mr. Kay told Ms. McAlister and Mr. Block *not* to change or correct the fraudulent reports, in an apparent effort to avoid public disclosure of the Company's faltering financial performance." As the result of his day-to-day control over American Realty, Defendant Kay also knew, or was reckless in not knowing, that Defendant Schorsch directed Defendants Block and McAlister to conceal the improper accounting by converting to the "gross" method of reporting AFFO and fraudulently deferring the accrual of second quarter expenses. Defendant Kay's scienter is further demonstrated by the

fact that he was asked to step down from his position at American Realty on or about December 15, 2014.

99.    Defendant Grant Thornton served as American Realty's outside auditor before and during the Relevant Period, and was therefore intimately familiar with the Company's accounting policies, including its calculation of AFFO.  In connection with its 2013 annual audit, Grant Thornton issued an unqualified audit opinion that certified American Realty's false and misleading financial statements included in its Form 10-K filed with the SEC.  Given its familiarity with American Realty's accounting and calculation methodologies, Defendant Grant Thornton knew or was reckless in not knowing that American Realty had improperly changed its AFFO-calculation methodology, and was impermissibly "adding back" certain costs to AFFO. Defendant Grant Thornton further knew or was reckless in not knowing that this change improperly inflated American Realty's reported AFFO.  Defendant Grant Thornton's scienter is further demonstrated by the fact that, when Defendant McAlister emailed Jessica Estrada, a Manager at Grant Thornton, calling attention to American Realty's manipulative accounting, Defendant Grant Thornton directed McAlister to sign American Realty's Second Quarter 2014 Form 10-Q and file the false financial statements with the SEC.  Defendant Grant Thornton did nothing at the time to determine how widespread the reported misconduct was, by what amount American Realty's financial statements were potentially misstated, or if other violations of GAAP were occurring.

100.    Further facts support a strong inference of scienter for the Defendants listed above.  As detailed above, American Realty and its executives repeatedly told investors that the Company had achieved "record" AFFO, emphasizing that this financial metric was a particularly important measure to evaluate the Company's stock.  As summarized above, at each reporting

period during the Relevant Period, these Defendants singled out the Company's purportedly strong AFFO.  These Defendants were aware of the fact that the market was relying on these statements, as analysts published numerous reports that underscored the Company's "record" AFFO. Given that these Defendants repeatedly stressed to investors that AFFO was a critical measure of the Company's financial health, any failure to confirm that their repeated statements about the Company's AFFO were materially accurate supports an inference of recklessness, at a minimum.

## VI.    <u>MATERIALLY FALSE AND MISLEADING STATEMENTS</u>

101.    Throughout the Relevant Period, Defendants made materially false and misleading statements and omissions concerning American Realty's financial performance and condition.  Specifically, as explained in detail above and summarized below:

(a)    American Realty's internal accounting controls and procedures were insufficient to provide reasonable assurances regarding the reliability of American Realty's financial reporting and the preparation of its financial statements;

(b)    American Realty's financial statements were materially false and misleading as they did not accurately reflect the Company's financial performance.  In an effort to avoid public disclosure of American Realty's faltering financial performance, American Realty changed, among other things, its historical AFFO-calculation methodology resulting in American Realty's reported AFFO number being materially inflated and false;

(c)    American Realty was not, as it represented in its financial statements, applying the "net" method of calculating AFFO.  Rather, the Company was intentionally and improperly adding back costs that were not associated with its ownership interest in the Operating Partnership;

(d)     Defendants had no reasonable basis to believe, and did not in fact believe, their statements detailed herein about the Company's financial performance and its 2014 AFFO estimates;

(e)     the Company's rapid pace of mergers and acquisitions during the Relevant Period had exacerbated the deficiencies in American Realty's internal controls and financial reporting processes; and

(f)     American Realty's "growth by acquisition" strategy was not beneficial for American Realty shareholders, but instead was designed to generate transaction fees for Schorsch-controlled companies and to result in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction.

### A.     First Quarter 2013 Financial Results

102.    The Relevant Period begins on May 6, 2013, when American Realty issued a press release announcing its "Record First Quarter 2013 Operating Results" ("First Quarter 2013 Press Release").  That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit.  The First Quarter 2013 Press Release reported an AFFO of $30.8 million, or $0.20 per fully diluted share, compared to AFFO of $3.4 million during the fourth quarter of 2012.

103.    The First Quarter 2013 Press Release contained the following statement from Defendant Schorsch regarding the Company's financial results:

> We are very pleased with our first quarter results which are in line with our earlier 2013 earnings guidance, ***projecting earnings growth of 16% between 2013 and 2014***, and we are particularly well positioned for continued earnings growth…. ***We intend to continue executing our highly accretive organic acquisition program on which our earnings guidance is constructed …***

104.    The First Quarter 2013 Press Release also stated:

American Realty considers FFO and AFFO, which is FFO as adjusted to exclude acquisition-related fees and expenses, amortization of above-market lease assets and liabilities, amortization of deferred financing costs, straight-line rent, non-cash mark-to-market adjustments, amortization of restricted stock, non-cash compensation and gains and losses *useful indicators of the performance of a REIT*. Because FFO calculations exclude such factors as depreciation and amortization of real estate assets and gains or losses from sales of operating real estate assets (which can vary among owners of identical assets in similar conditions based on historical cost accounting and useful-life estimates), *they facilitate comparisons of operating performance between periods and between other REITs in our peer group.*

\*       \*       \*

Additionally, the Company believes that AFFO, by excluding acquisition-related fees and expenses, amortization of above market lease assets and liabilities, amortization of deferred financing costs, straight-line rent, non-cash mark-to-market adjustments, amortization of restricted stock, non-cash compensation and gains and losses, provides information consistent with management's analysis of the operating performance of the properties. *By providing AFFO, American Realty believes it is presenting useful information that assists investors and analysts to better assess the sustainability of our operating performance. Further, American Realty believes AFFO is useful in comparing the sustainability of our operating performance with the sustainability of the operating performance of other real estate companies, including exchange-traded and non-traded REITs.*

*As a result, the Company believes that the use of FFO and AFFO, together with the required GAAP presentations, provide a more complete understanding of our performance relative to our peers and a more informed and appropriate basis on which to make decisions involving operating, financing, and investing activities.*

105.    Also on May 6, 2013, American Realty filed with the SEC its Form 10-Q for the quarter ended March 31, 2013 ("First Quarter 2013 Form 10-Q"). The First Quarter 2013 Form 10-Q was signed by Schorsch and Block, contained the same financial results and AFFO figures from the First Quarter 2013 Press Release, and represented that those financial results were accurate and presented in accordance with GAAP. The First Quarter 2013 Form 10-Q also contained substantially similar statements about AFFO, including that it was a "useful" indicator of performance and facilitated comparisons between American Realty and other REITs.

106.    The First Quarter 2013 Form 10-Q included the following table that quantified "the items deducted or added to net loss in our calculation of FFO and AFFO for the three months ended March 31, 2013 and 2012 (amounts in thousands). ***Amounts are presented net of any non-controlling interest effect where applicable***":

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2013 | 2012 |
| Net loss attributable to stockholders (in accordance with U.S. GAAP) | $ (137,920) | $ (5,028) |
| Merger and other transaction costs | 137,769 | — |
| Gain on held for sale properties | (14) | 323 |
| Realized gains on investment securities | (451) | — |
| Depreciation and amortization | 25,109 | 3,535 |
| FFO | 24,493 | (1,170) |
| | | |
| Acquisition and transaction related costs | 5,582 | 4,785 |
| Amortization of above-market lease | 63 | — |
| Amortization of deferred financing costs | 1,108 | 211 |
| Straight-line rent | (1,370) | (221) |
| Non-cash equity compensation expense | 876 | 146 |
| AFFO | $ 30,752 | $ 3,751 |

107.    Note 3 to the First Quarter 2013 Form 10-Q, which was entitled "Summary of Significant Accounting Policies," represented that American Realty's financial statements "were prepared in conformity with U.S. GAAP" and that they included "all adjustments and accruals of a normal recurring nature, which, in the opinion of management, are necessary for a fair presentation of results for the interim periods."

108.    Under Item 4, Controls and Procedures, Disclosure Controls and Procedures, American Realty represented that Defendants Schorsch and Block had evaluated the

effectiveness of ARCP's disclosure controls and procedures and determined that they were effective.  Specifically, it stated that:

> In accordance with Rules 13a-15(b) and 15d-15(b) of the Securities Exchange Act, as amended (the "Exchange Act"), we, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q and determined that the disclosure controls and procedures are effective.

> No change occurred in our internal controls over financial reporting (as defined in Rule 13a-15(f) and 15d-15(f) of the Exchange Act) during the three months ended March 31, 2013 that has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting.

109.    Further, in accordance with § 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), the First Quarter 2013 Form 10-Q contained Certifications signed by Defendants Schorsch and Block that affirmed that American Realty's financial statements were accurate, and that Defendants Schorsch and Block had designed and implemented internal controls over financial reporting that provided reasonable assurance that American Realty's financials were reliable and complied with GAAP.  Specifically, the SOX Certifications provided, in relevant part:

1.    I have reviewed this Quarterly Report on Form 10-Q of American Realty Capital Properties, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]

110.    After the market closed on May 6, 2013, American Realty held a conference call to discuss the Company's first quarter of 2013 results.  During the conference call, Defendant

Schorsch re-articulated American Realty's growth strategy, and highlighted the purportedly "record" financial results:

> ***We intend to grow our asset base and AFFO per share through both the execution of our organic acquisition program on which our earnings guidance is constructed, as well as through the pursuit of opportunities to buy large property portfolios and make strategic corporate acquisitions in the net lease sector. American Realty saw a 600% increase in revenue for the first quarter of 2013 compared to our fourth quarter of 2012 results and both FFO and AFFO per share increased in the first quarter 2013 compared to the fourth quarter of 2012.***

111.    Defendant Block also noted that "[a]s we look at our projections for the balance of 2013, we reaffirm our forecasted AFFO per share of between $0.91 and $0.95 per share that was provided in our earnings guidance, as well as the forecast 2014 AFFO per share of $1.06 to $1.10."

### B.    CapLease Acquisition Announcement

112.    On May 28, 2013, American Realty issued a press release announcing that it had entered into an agreement to acquire CapLease, Inc. in a $2.2 billion transaction ("CapLease Press Release").  That same day, American Realty filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit.  In the release, Defendant Block commented that the transaction would result in significant value to American Realty shareholders:

> This transaction offers significant operating synergies and value to our shareholders … ***We have announced revised earnings guidance for 2014 of between $1.17 to $1.21 per share based on AFFO, representing a 28% increase over previously announced 2013 guidance.***

113.    The release also articulated that the transaction provided numerous benefits to American Realty's portfolio, including (1) Strategic Alignment; (2) Accretion to Earnings and Dividends; (3) Increased Diversification; (4) Maintains High Occupancy Levels and Low Lease

Rollover; (5) Increased Size and Scale; (6) Impact on Balance Sheet; and (7) Management Additions, Integration and Operating Synergies.

114.    During a May 28, 2013 conference call with analysts and investors, Defendants Schorsch and Block further outlined the purported benefits of the CapLease acquisition. Defendant Schorsch stated that the transaction would result in "accretive growth," "11% accretion to our AFFO in 2014" and "improved rental revenue quality through portfolio diversification." He also stated that it would result in "meaningful earnings accretion. Pro forma 2014 we expect to add $0.11 per share to our AFFO. And based on doing that and upon closing, we anticipate raising the dividend $0.03 per share to $0.94." Defendant Block remarked that the transaction supposedly resulted in financial projections that were "impressive" and that American Realty was revising its 2014 estimates upward. Specifically, Defendant Block stated that "*[t]he new 2014 earnings guidance range is projected between $1.17 to $1.21 AFFO per share on a fully diluted basis … [which] represents a 28% increase compared to our projected 2013 results.*"

### C.    ARCT IV Merger Announcement

115.    On July 2, 2013, American Realty issued a press release "American Realty Capital Properties to Acquire American Realty Capital Trust IV in a Merger Transaction Valued at $3.1 Billion" ("ARCT IV Press Release"). That same day, American Realty filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit. American Realty noted that, in connection with the proposed merger, American Realty was increasing its "2014[] … [AFFO] guidance to $1.19-$1.25 per share, equivalent to approximately 31% growth over 2013[] AFFO per share at the midpoint of the respective ranges. This projected AFFO growth rate leads the net lease industry."

116.    Defendant Schorsch commented that the transaction would result in significant value to American Realty shareholders, stating:

> ***With this acquisition we continue to further diversify our asset and tenant base and increase our projected 2014 AFFO per share.***  This acquisition is yet another example of executing our deliberate and focused strategy to: build size in an industry where size matters; improve profitability; increase asset and tenant diversification, thus mitigating risk; focus on constructing a portfolio of properties that produces durable income and potential asset appreciation, while preserving capital investment; provide some inflation and interest rate protection; ***and give us further cost of capital advantages enabling us to deliver AFFO per share earnings accretion. Our sector-leading 31% 2014 over 2013 projected AFFO growth is further proof of that.***

117.    Defendant Block was similarly positive about the effect of the ARCT IV Merger, stating:

> ***This will result in growth in projected 2014 AFFO per share, as well as reduced balance sheet leverage.*** … In addition, ***we are increasing our annualized per share dividend by $0.03, yet reducing our AFFO payout ratio below 80%, which provides capacity for further dividend increases in 2014, consistent with prior practice.***

118.    The press release also highlighted that the ARCT IV Merger came along with the following supposed "strategic, financial and portfolio benefits": (1) AFFO Growth; (2) Enhanced Portfolio Diversification; (3) Increased Lease Duration; (4) Increased Size and Scale; and (5) Operating Synergies and Cost Reduction.

119.    Later that day, American Realty held a conference call to discuss the proposed ARCT IV Merger.  During the call, Defendant Schorsch spoke about the proposed transaction and its impact on the Company, stating:

> As we will discuss, however, ***this acquisition is not about growth for its own sake.***
>
> \*        \*        \*
>
> ***We will increase our dividend by $0.03 per share from $0.91 to $0.94 per share while at the same time taking our payout ratio down to 80%. We are also increasing our AFFO earnings guidance range for 2014 to $1.19 to $1.25 per share.***

*     *     *

I would like to take you through some of the significant benefits we believe this transaction offers our shareholders.  *The transaction will provide immediate accretion to our earnings once closed.  Accordingly, we have revised our 2014 earnings guidance, increasing the pro forma 2014 AFFO to $1.19 to $1.25; annualized dividend increase from $0.91 to $0.94 per share, while the AFFO payout ratio decreases to less than 80%.*

120.    Likewise, Defendant Block explained how he expected the ARCT IV Merger would help to maximize shareholder returns:

*AFFO per share is expected to grow significantly from 2013 to full year 2014. For 2014, we're projecting fully diluted AFFO per share in the range of between $1.19 per share to $1.25. This represents a growth rate of about 30% over 2013 AFFO per share.   This earnings percentage of year-over-year growth is unprecedented in the net lease sector as we continue to aggregate world-class portfolios.*

**D.     July 2013 Investor And Analyst Day**

121.    On July 24, 2013, American Realty held an "Investor and Analyst Day" to discuss "the Company's recent activity, 2013 mid-year outlook and future initiatives."   During a presentation, Defendant Block commented on the "very conservative" nature of the Company's increased full-year 2014 AFFO per share estimates, and responded to an analyst's question on that topic, stating in pertinent part:

. . . So again to recap, June 30th, ARC Trust, CapLease, well in your guidance, you said you were going to buy about another $300 million. I wish I can say these are the exact transactions we're going to buy.  We actually have a more robust pipeline today that 300, maybe 400 or 500, we will see where that works out, but as a placeholder again to understand how do we get to that $1.19 or $1.25 on your earnings guidance, we're assuming post transactions, the organic transactions we do. The one-off two CVS', three Walgreens, four Dollar General's, one Advance Auto, that composes the $300 million of what we define as organic growth. . . . We have an abundance of that in our pipeline right now, very attractive credit, extremely attractive pricing with great locations. . . .

*     *     *

*We're going to be roughly $450 million of AFFO which equates to about [$]1.19.*

*     *     *

> ***Now we give a range $1.19 or $1.25***. What could happen there? Well, our stock could be better. . . .

\*     \*     \*

> So we have a range there, [what] I wanted to do ***on a very conservative basis***, is roll you forward to the different capital components and acquisition numbers that will arrive at this $1.19 that we put out there. . . .

122.     The statements referenced above in ¶¶102-21 were each materially false and misleading and omitted material facts when made.

(a)     Contrary to the statements referenced above in ¶¶108-9, American Realty's internal accounting controls and procedures were insufficient to provide reasonable assurances regarding the reliability of American Realty's financial reporting and the preparation of its financial statements;

(b)     Contrary to the statements referenced above in ¶¶102-21, American Realty's financial statements were materially false and misleading as they did not accurately portray the Company's "faltering" financial performance and were not prepared in accordance with GAAP;

(c)     Contrary to the statements referenced above in ¶¶102-21, American Realty was not, as it represented in its financial statements, applying the "net" method of calculating AFFO.  Rather, the Company was intentionally and improperly adding back costs that were not associated with its ownership interest in the Operating Partnership;

(d)     Contrary to the statements referenced above in ¶¶102-21, American Realty's 2014 AFFO estimates were not accurate, attainable, honestly believed, or founded on a reasonable basis;

(e)     Contrary to the statements referenced above in ¶¶108-9, the rapid pace of mergers and acquisitions during the Relevant Period exacerbated the deficiencies in American Realty's internal controls and financial reporting processes; and

(f)     Contrary to the statements referenced above in ¶¶102-21, American Realty's "growth by acquisition" strategy was not beneficial for American Realty shareholders, but instead was designed to generate transaction fees for Schorsch-controlled companies and to result in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction.

### E.     Second Quarter 2013 Financial Results

123.     On August 6, 2013, American Realty issued a press release announcing "Record Second Quarter 2013 Operating Results" ("Second Quarter 2013 Press Release").  That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit.  The Second Quarter 2013 Press Release reported AFFO of $32.8 million, or $0.19 per fully diluted share.  In addition, the Company raised its previously issued full-year 2014 AFFO per share estimates from a range of $1.06 to $1.10 per diluted share, to a range of $1.14 to $1.18 per diluted share.

124.     The Second Quarter 2013 Press Release contained the following statement by Defendant Schorsch concerning the Company's financial results:

> The second quarter of 2013 was about deliberate and predictable execution in all aspects of our business … Our strategic vision is furthered with the completion of the two pending mergers, *a substantial and highly accretive acquisition pipeline* and a growing team of seasoned real estate professionals as we look towards a future internalization event.

125.     The Second Quarter 2013 Press Release also contained language, substantially identical to the language contained in the First Quarter 2013 Press Release with respect to the importance of AFFO.  *See* ¶104, above.

45

126.    Also on August 6, 2013, American Realty filed with the SEC its Form 10-Q for
the quarter ended June 30, 2013 ("Second Quarter 2013 Form 10-Q").  The Second Quarter 2013
Form 10-Q was signed by Defendants Schorsch and Block, contained the same financial results
and AFFO figures from the Second Quarter 2013 Press Release, and represented that those
financial results were accurate and presented in accordance with GAAP.  The Second Quarter
2013 Form 10-Q also contained substantially similar statements about AFFO as compared to the
First Quarter 2013 Form 10-Q.  *See* ¶¶104-5, above.

127.    In addition, the Company provided the following table that quantified "the items
deducted or added to net loss in our calculation of FFO and AFFO for the three months ended
June 30, 2013 and 2012 (amounts in thousands)" and assured investors that the listed amounts
were "***presented net of any non-controlling interest effect where applicable***":

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2013 | 2012 | 2013 | 2012 |
| Net loss attributable to stockholders (in accordance with U.S. GAAP) | $ (51,679) | $ (7,070) | $ (189,613) | $ (12,098) |
| Merger and other transaction costs | 4,680 | 20 | 142,449 | 20 |
| Loss on contingent valuation rights | 31,134 | — | 31,134 | — |
| (Gain) loss on held for sale properties | — | 82 | (14) | 405 |
| Gain on sale of investment securities | — | — | (451) | — |
| Loss on derivative instruments | 40 | — | 45 | — |
| Interest on convertible obligation to preferred investors | 1,630 | — | 1,630 | — |
| Depreciation and amortization | 27,806 | 6,994 | 52,829 | 10,529 |
| FFO | 13,611 | 26 | 38,009 | (1,144) |
|  |  |  |  |  |
| Acquisition and transaction related costs | 15,144 | 7,814 | 20,726 | 12,599 |
| Amortization of above-market lease | 63 | — | 126 | — |
| Amortization of deferred financing costs | 2,166 | 385 | 3,274 | 596 |
| Straight-line rent | (1,605) | (352) | (2,975) | (565) |
| Non-cash equity compensation expense | 3,454 | 178 | 4,330 | 324 |
| AFFO | $ 32,833 | $ 8,051 | $ 63,490 | $ 11,810 |

128.    Note 3 to the Second Quarter 2013 Form 10-Q, which was entitled "Summary of Significant Accounting Policies," represented that American Realty's financial statements "were prepared in conformity with U.S. GAAP" and that they included "all adjustments and accruals of a normal recurring nature, which, in the opinion of management, are necessary for a fair presentation of results for the interim periods."

129.    The Second Quarter 2013 Form 10-Q also contained the same internal disclosure controls Certifications and SOX Certifications that were included with American Realty's First Quarter 2013 Form 10-Q.  *See* ¶¶108-9, above.  Again, Defendants Schorsch and Block signed the Certifications.

130.    After the market closed, Defendants held a conference call to discuss the Company's second quarter of 2013 results.  During the call, Defendant Schorsch made the following statements about American Realty's results:

> Full quarter AFFO per share was $0.19.  More importantly, the normalized AFFO per share, which also represents the period end run-rate, was $0.23 per share **which was above our previously provided 2013 AFFO guidance**.
>
> \*       \*       \*
>
> To sum up, **we are extremely pleased with our accomplishments during this second quarter** … **Our current pipeline of acquisitions and balance sheet strength suggests that American Realty is well-positioned for continued earnings growth.**
>
> As Brian will discuss in a moment … **we are updating our guidance to $1.14 to $1.18 per share on an AFFO basis.**  This change to our earnings guidance results primarily from two factors – and this is very important. We will incur approximately $20 million in our guidance of additional debt service cost relating to terming out the fixed debt and increasing our acquisitions to $1.1 billion.

131.    Defendant Block also highlighted that American Realty revised upward its 2014 AFFO guidance "**based on increased acquisition activity** as well as a more deliberate pursuit of fixed-rate, long-term, match-funded debt."  Additionally, Defendant Block stated:

> *Our revised 2014 AFFO guidance is $1.14 to $1.18 per share*, reflecting additional interest costs related to increased duration of fixed rate borrowings to match fund assets and liabilities … and substantially higher acquisition volumes than previously projected. Specifically, we include about $1.4 billion of five, seven and ten year notes with a weighted average interest rate of approximately 4.1%.

### F.      Cole Merger Announcement And Press Release

132.     On October 22, 2013, American Realty and Cole, Inc. entered the Cole Merger Agreement.   Pursuant to the agreement, Cole, Inc. shareholders would receive either 1.0929 shares of American Realty common stock or $13.82 in cash per Cole, Inc. share.   On October 23, 2013, American Realty and Cole, Inc. issued a press release entitled "American Realty Capital Properties and Cole Real Estate Investments Merge to Create World's Largest Net Lease REIT with Enterprise Value of $21.5 Billion" ("Cole Merger Press Release").   That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit.   The release announced that the transaction would be beneficial to shareholders, highlighted that the merger would result in "AFFO Growth" and result in "[u]pdated American Realty AFFO pro forma 2014 guidance of $1.13 to $1.19 per share."   The Company also filed various other merger-related documents with the SEC, including a copy of the Merger Agreement, a copy of the Voting Agreement and copies of related Letter Agreements.

133.     In the Cole Merger Press Release, Defendant Schorsch commented that, as a result of the merger:

> American Realty will become the largest net lease REIT and the new industry leader.… Both companies share the same vision, *namely to drive value for stockholders by placing their interests ahead of our own, aligning pay with performance, and reporting fully and transparently*. We share the same disciplined investment philosophy and investment processes, which are focused on investment grade tenancy, long lease durations, a strong diversified tenant base, and a mix of property type and geography.

*      *      *

As we enter 2014, we stand to become the largest listed net lease REIT. With this acquisition, we continue to further diversify our asset and tenant base while **driving projected 2014 AFFO per share growth.** This acquisition represents the continuation of our deliberate and focused growth strategy by improving profitability, mitigating risk through increased property type and tenant diversification, constructing a portfolio of properties that produce durable income and potential asset appreciation while preserving principal, providing some inflation and interest rate protection and **enabling us to deliver AFFO per share earnings accretion through further cost of capital advantages. In addition, the merger with Cole furnishes the size and scale to allow us to continue to reduce our operating costs as a percentage of assets and potentially improve our AFFO multiple.**

134.    In the Cole Merger Press Release, Defendant Cole was similarly bullish about the merger, stating:

We are pleased to have reached this agreement with American Realty, **which we believe provides compelling value and significant equity upside potential for Cole stockholders** at a time when we believe the industry is consolidating. … This transaction represents a major step in achieving our goal of creating the premier real estate company that delivers best-in-class long-term results to our clients. … I am very proud of our exceptional team and am confident that they will become an integral part of the American Realty family.

135.    Later that day, American Realty held a conference call with analysts and investors to discuss the merger. During the conference call, executives from both companies continued to tout the supposed benefits of the merger for shareholders. Defendant Schorsch stated:

**This is an epic transaction. Great companies combining in a win-win to the shareholders, the employees and the broker-dealer systems that we work with. The portfolios just fit. They fit very, very well. We're a much stronger company.**

We have a – we have both proven ourselves. And if you look back at the last six months, as we've gone through this transaction, we as a company have improved at American Realty – we've become investment-grade rated; we've managed our balance sheet and a number of other mergers to build a larger company of over $10 billion on a pro forma basis … today, we have created, with this merger, the largest net lease company on the globe.

*        *        *

49

Now let's talk about dividends. The common dividend at closing will be increased $1.00 per share on the American Realty stock price. American Realty shareholders are getting a 6.4% dividend increase.

136.   Additionally, the following exchange regarding the transaction took place between analyst Mitch Germain of JMP Securities and Defendant Schorsch:

**Analyst Germain**: … I guess from that regard, the deal should be considered slightly dilutive.  Is that the way to look at it here?

**Defendant Schorsch**:   *No, actually, no. If you look at Cole's acquisition pipeline, it was $500 million. If you look at our acquisition pipeline, it was $1 billion. So it's increased by $500 million. But we've also de-levered incredibly. So you've gone down by a full turn plus on debt to EBITDA without issuing equity to the public markets, without a discount, without a banking fee.*

So on a leverage-neutral basis, it would obviously be highly accretive, but we don't want to be leverage-neutral. Neither us nor the Cole team want to be a company at nine times debt to EBITDA or 55% levered.  So our goal is to be 6.5 times. And quite honestly, if you look at the fact that we're issuing cash, if that cash issuance goes down, we could actually be in the 6's coming out of the box, and garner significant upgrade from the agencies.

So, we believe that we're taking the excess value and driving a more -- a higher quality of earnings, Mitch. ***So the answer to your question is, on a par basis, yes, it's leveraged -- it's effectively neutral or slightly dilutive. But we're also going from 9.1 times to 7.7 times, and that's a powerful statement.***

137.   Likewise, Defendant Block stated:

***Specific to adjusted funds from operations, or AFFO for 2014, our guidance remains unchanged with this transaction from a numbers' standpoint. We expanded the range slightly, due to the fact that we have variability here.  In closing this merger within the first half of 2014, our guidance range on a fully diluted per-share basis is $1.13 to $1.19 per share.***

\*       \*       \*

Turning our attention specifically to 2014 guidance, I wanted to point out a range – from an FFO standpoint, fully diluted share count, as we talked about – $1.14 to $1.20; ***AFFO, $1.13 to $1.19.***  The key assumptions . . . include[] $11.2 billion purchase price for Cole. It assumes an election of 80% stock and 20% cash. We're assuming a $70 million expense reduction in aggregate from the combined organization. The distributions go up to $1.00 per share, and again, representing an 86% payout ratio.

138.    Additionally, the following exchange regarding American Realty's AFFO estimates took place between analyst Dan Donlan of Ladenburg Thalmann and Defendant Block:

> **Analyst Donlan**: Okay. And as far as when I look at the guidance, the range is wider now. What is – what's the delta between the two?  I mean, is it you don't close on as many acquisitions and timing? Is it that your leverage would be higher at the high-end and lower at the low-end?  What are the brackets . . . around the guidance range?
>
> \*     \*     \*
>
> **Defendant Block**: … Dan, in that number it also has to do with the cost of debt. If debt – if our debt cost comes down 15 or 20 bps, that we're going to be – we're going to push through the high end of the range very quickly. And if it's where we think it is, which is pretty conservative, we'll be middle, low-end of the range. I think that's probably the single biggest driver when you look at the variability. Because 5 basis points on acquisition cap rate, we can buy a lot more. The question is, do we want to? Because we don't want to lever up. And it also assumes our stock price, our combined stock price, being pretty conservative around 7% dividend yield.  And I'm not sure we're going to stay at a 7% dividend yield. So, those are – that's the other big variable, because if we're buying assets and we're issuing equity, and the equity cost changes to the upside, *it's going to increase our earnings dramatically.*

139.    Additionally, Defendant Nemer, the CEO of Cole, Inc., extolled the virtues of the transaction for shareholders:

> This transaction represents a major step in achieving our goal of creating the premier real estate company that delivers best-in-class, long-term results to our shareholders.   The combination is forward thinking, and our union provides immediate and obvious benefits of size, scale and diversification.
>
> \*     \*     \*
>
> And I'd like to commend Nick Schorsch and his team at American Realty for coming together and trying to – as Nick said, *this combination makes all the sense in the world. It's truly a one-plus-one-equals-five combination of a – transactions of this magnitude, this significant, that are this transformational, rarely come together.*  And so, I give – my hat's off to Nick and his team for the effort that they've made over the last year, to make themselves a more compelling strategic partner, and for putting terms on the table that produce terrific results for both of our shareholders, both in the immediate term and the long-term.

140.    The statements referenced above in ¶¶123-39 were each materially false and misleading and omitted material facts when made.  The true facts were that:

(a)     Contrary to the statements referenced above in ¶129, American Realty's internal accounting controls and procedures were insufficient to provide reasonable assurances regarding the reliability of American Realty's financial reporting and the preparation of its financial statements;

(b)     Contrary to the statements referenced above in ¶¶123-39, American Realty's financial statements were materially false and misleading as they did not accurately portray the Company's "faltering" financial performance and were not prepared in accordance with GAAP;

(c)     Contrary to the statements referenced above in ¶¶123-39, American Realty was not, as it represented in its financial statements, applying the "net" method of calculating AFFO.  Rather, the Company was intentionally and improperly adding back costs that were not associated with its ownership interest in the Operating Partnership;

(d)     Contrary to the statements referenced above in ¶¶123-39, American Realty's 2014 AFFO estimates were not accurate, attainable, honestly believed, or founded on a reasonable basis;

(e)     Contrary to the statements referenced above in ¶129, the rapid pace of mergers and acquisitions during the Relevant Period, including the Cole Merger, exacerbated the deficiencies in American Realty's internal controls and financial reporting processes; and

(f)     Contrary to the statements referenced above in ¶¶123-39, American Realty's "growth by acquisition" strategy was not beneficial for American Realty shareholders, but instead was designed to generate transaction fees for Schorsch-controlled companies and to result in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction.

G. **Third Quarter 2013 Financial Results**

141.     On November 7, 2013, American Realty issued a press release entitled "American Realty Capital Properties Announces Third Quarter 2013 Operating Results and $0.21 AFFO per Share" ("Third Quarter 2013 Press Release").  That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit.  The release announced AFFO of $46.7 million, or $0.21 per diluted share and confirmed "[u]pdated AFFO pro forma 2014 guidance of $1.13 to $1.19 per share."

142.     The Third Quarter 2013 Press Release contained the following comment from Defendant Schorsch regarding the Company's financial results:

> We have continued to build enterprise value during this third quarter, and for now are intently focused on execution . . . . In this regard, we have identified several near-term key objectives: completing the announced ARCT IV and Cole transactions; becoming self-managed and significantly broadening our intellectual capital by continuing to attract the best and brightest managers in the industry; deleveraging and terming out our balance sheet utilizing long-term, fixed rate debt; and effectively and seamlessly integrating Cole organization.
>
> *     *     *
>
> ***We are fully committed to becoming self-managed, as promised*** . . . . In fact, it is a closing condition for our merger with Cole.  We will announce the President of American Realty before year-end.  We have already moved to bolster our team with several key hires.  Brian Block, our CFO, will now be focused exclusively on American Realty.  Lisa Beeson joins us as COO after 25 years as an investment banker with tremendous M&A and capital markets expertise. Lisa Pavelka McAlister is our new CAO with 25 years' experience in senior financial roles versed in all aspects of financial and accounting operations.

143.     The Third Quarter 2013 Press Release also contained language similar to that included in other press releases during the Relevant Period with respect to the importance of AFFO.  *See* ¶¶104, 125, above.

144.     Also on November 7, 2013, American Realty filed with the SEC its Form 10-Q for the quarter ended September 30, 2013 ("Third Quarter 2013 Form 10-Q").  The Third Quarter 2013 Form 10-Q was signed by Defendants Schorsch and Block, contained the same financial

results and AFFO figures from the Third Quarter 2013 Press Release, and represented that those financial results were accurate and presented in accordance with GAAP.  The Third Quarter 2013 Form 10-Q also contained substantially similar statements about AFFO as compared to the other Form 10-Qs during the Relevant Period.  *See* ¶¶104-5, 126, above.

145.    In addition, the Company provided the following table that quantified "the items deducted or added to net loss in our calculation of FFO and AFFO for the three months ended September 30, 2013 and 2012 (amounts in thousands)," and assured investors that the listed amounts were "***presented net of any non-controlling interest effect where applicable***":

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 |
| Net loss attributable to stockholders (in accordance with U.S. GAAP) | $ (59,063) | $ (12,690) | $ (248,676) | $ (24,788) |
| (Gain) loss on held for sale properties | – | 47 | (14) | 452 |
| Depreciation and amortization | 39,382 | 11,632 | 92,211 | 22,161 |
| FFO | (19,681) | (1,011) | (156,479) | (2,175) |
| Acquisition related | 1,235 | 14,636 | 21,961 | 27,235 |
| Merger and other transaction costs | 3,791 | – | 146,240 | 20 |
| Loss on contingent valuation rights | 38,542 | – | 89,676 | – |
| Gain on sale of investment securities | – | – | (451) | – |
| Loss on derivative instruments | 99 | – | 144 | – |
| Interest on convertible obligation to preferred investors | 7,266 | – | 8,896 | – |
| Interest on convertible debt | 1,554 | – | 1,554 | – |
| Interest premium on settlement of convertible obligation to preferred investors and convertible debt | 5,174 | – | 5,174 | – |
| Amortization of above-market lease | 63 | – | 189 | 36 |
| Amortization of deferred financing costs | 3,505 | 385 | 6,914 | 1,226 |
| Straight-line rent | (2,063) | (581) | (5,038) | (1,147) |
| Non-cash equity compensation expense | 7,180 | 480 | 11,510 | 804 |
| AFFO | $ 46,665 | $ 13,900 | $ 110,290 | $ 26,019 |

146.    Note 3 to the Third Quarter 2013 Form 10-Q, which was entitled "Summary of Significant Accounting Policies," represented that American Realty's financial statements "were

prepared in conformity with U.S. GAAP" and that they included "all adjustments and accruals of a normal recurring nature, which, in the opinion of management, are necessary for a fair presentation of results for the interim periods."

147.    The Third Quarter 2013 Form 10-Q also contained the same internal disclosure controls Certifications and SOX Certifications that were included with American Realty's other Form 10-Qs filed during the Relevant Period.  *See* ¶¶108-9, 129, above.  Again, Defendants Schorsch and Block signed the Certifications.

148.    After the market closed, Defendants held a conference call to discuss the Company's third quarter of 2013 results.   During the call, Defendant Schorsch made the following statement about American Realty's results:

> We continue to see attractive organic acquisition opportunities with no shortage of available product in the market, high-quality property, strong tenants, long leases, and accretive pricing. ***Our 2014 AFFO earnings guidance, which reflects the acquisition of Cole, assumes a closing date of April 1 and is $1.13 to $1.19 per share.***

149.    Defendant Block also made the following statement related to the Cole Merger:

> In connection with the Cole merger, we widened our 2013 guidance by $0.01 on each side of the range based on the uncertainty with respect to the anticipated closing date. . . .
>
> ***Our 2014 AFFO guidance is $1.13 to $1.19 per share.*** This range, which assumes the Cole merger to close the end of the first quarter of 2014, reflects additional interest costs attributable to increased duration of fixed rate borrowings to match fund, assets and liabilities, as I previously noted, and higher acquisition volumes than previously projected, reflecting increased capacity of the combined teams.

### H.    Cole Merger Presentation

150.    On November 12, 2013, Defendants issued a shareholder presentation regarding the Cole Merger, which reiterated that the merger would create the world's largest net lease REIT and would generate "significant operating efficiencies" and "AFFO growth" for American Realty.   The presentation also reiterated that "2014 AFFO growth estimates" were being

"updated to $1.13 to $1.19 per share (fully diluted)" and indicated that, even without additional acquisitions, American Realty's AFFO for 2014 would be "$1.13 per share."

**I.    Cole Merger Proxy Materials**

151.    On December 20, 2013, American Realty and Cole, Inc. filed the Cole Registration Statement with the SEC.  On December 23, 2013, the Company filed the Cole Merger Proxy with the SEC.  A copy of the Cole Merger Agreement was attached to both the Cole Registration Statement and the Cole Merger Proxy and was incorporated by reference in both documents.

152.    The Cole Merger Proxy presented financial data for American Realty for the first nine months of 2013, ending September 30, 2013, and represented that "[i]n [American Realty's] opinion, such unaudited financial statements include all adjustments (consisting of normal recurring adjustments) necessary for a fair presentation of the interim September 30, 2013 financial information."

153.    In addition, the Company provided the following table that quantified "items deducted or added to net loss in our calculation of FFO and AFFO for the three and nine months ended September 30, 2013 and 2012" and assured investors that the amounts listed were "*presented net of any non-controlling interest effect where applicable* (in thousands)":

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2013 | 2012 | 2013 | 2012 |
| Net loss attributable to stockholders (in accordance with U.S. GAAP) | $ (59,063) | $ (12,690) | $(248,676) | $ (24,788) |
| (Gain) loss on held for sale properties | — | 47 | (14) | 452 |
| Depreciation and amortization | 39,382 | 11,632 | 92,211 | 22,161 |
| FFO | (19,681) | (1,011) | (156,479) | (2,175) |
| Acquisition related | 1,235 | 14,636 | 21,961 | 27,235 |
| Merger and other transaction costs | 3,791 | — | 146,240 | 20 |
| Loss on contingent valuation rights | 38,542 | — | 69,676 | — |
| Gain on sale of investment securities | — | — | (451) | — |
| Loss on derivative instruments | 99 | — | 144 | — |

| | | | |
|---|---|---|---|
| Interest on convertible obligation to preferred investors | 7,266 | — | 8,896 | — |
| Interest on convertible debt | 1,554 | — | 1,554 | — |
| Interest premium on settlement of convertible obligation to preferred investors and convertible debt | 5,174 | — | 5,174 | — |
| Amortization of above-market lease | 63 | — | 189 | 56 |
| Amortization of deferred financing costs | 3,505 | 385 | 6,914 | 1,226 |
| Straight-line rent | (2,063) | (581) | (5,038) | (1,147) |
| Non-cash equity compensation expense | 7,180 | 480 | 11,510 | 804 |
| AFFO | $ 46,665 | $ 13,909 | $ 110,290 | $ 26,019 |

154.   Additionally, the Cole Proxy Materials contained substantially similar representations as the American Realty SEC filings and press releases regarding the importance of AFFO including that it was a "useful" indicator of performance and facilitated comparisons between American Realty and other REITs.  *See, e.g.,* ¶¶104, 125, 143, above.

155.   The Cole Merger Agreement represented that American Realty's SEC filings and the financial data within those filings were free of material misstatements and omissions.  For example, Section 5.7(a) of the Cole Merger Agreement represented that "[e]ach [American Realty] SEC Filing … ***did not, at the time it was filed, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading***."

156.   Section 5.7(c) of the Cole Merger Agreement represented that American Realty and its subsidiaries "***have devised and maintain a system of internal accounting controls sufficient to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP***...."

157.   Section 5.7(c) of the Cole Merger Agreement further represented that American Realty's "principal executive officer and its principal financial officer" had disclosed to American Realty's auditor and the audit committee "(i) ***all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting that are***

*reasonably likely to adversely affect [American Realty's] ability to record, process, summarize and report financial data*, and (ii) *any fraud, whether or not material, that involves management or other employees who have a significant role in [American Realty's] internal controls*…."

158.   Additionally, as with American Realty's periodic financial statement filings during the Relevant Period, Section 5.7(c) of the Cole Merger Agreement represented that:

> [American Realty] ha[d] established and maintains disclosure controls and procedures (as such term is defined in Rule 13a-15 promulgated under the Exchange Act) designed to ensure that material information relating to [American Realty] required to be included in reports filed under the Exchange Act, including its consolidated subsidiaries, is made known to [American Realty's] principal executive officer and its principal financial officer by others within those entities, particularly during the periods in which the periodic reports required under the Exchange Act are being prepared, and, to the knowledge of [American Realty], such disclosure controls and procedures are effective in timely alerting [American Realty's] principal executive officer and its principal financial officer to material information required to be included in [American Realty's] periodic reports required under the Exchange Act.

159.   Section 5.8(a) of the Cole Merger Agreement represented that the information provided to investors in connection with the merger was free from untrue statements and omissions:

> None of the information supplied or to be supplied in writing on behalf of [American Realty] for inclusion or incorporation by reference in (i) the [Cole Registration Statement] will, at the time such document is filed with the SEC, at any time such document is amended or supplemented or at the time such document is declared effective by the SEC, *contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading*, or (ii) the Joint Proxy Statement will, at the date it is first mailed to the stockholders of [Cole, Inc. and of American Realty], at the time of the [Cole, Inc.] Stockholder Meeting and the American Realty[] Stockholder Meeting, at the time the Form S-4 is declared effective by the SEC or at the Effective Time, *contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading.*

160.    Section 6.2(c)(v) of the Cole Merger Agreement represented that American Realty would "maintain all financial books and records in all material respects in accordance with GAAP."

161.    American Realty's First Quarter 2013 Form 10-Q, Second Quarter 2013 Form 10-Q and Third Quarter 2013 Form 10-Q, which were each signed by Defendants Schorsch and Block and incorporated into the Cole Registration Statement and Cole Merger Proxy, each assured investors that:

> [W]e, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q and determined that the disclosure controls and procedures are effective.

162.    Defendants Schorsch, Kay, and Block, along with Defendants Kahane, Michelson, Rendell and Bowman, signed the Cole Merger Proxy and had direct participation in and oversight of the wrongdoing alleged herein, relating to those mergers.

**J.    Cole Merger Closing**

163.    On February 7, 2014, following approval by Cole, Inc. and American Realty shareholders, the Cole Merger closed.  The $11.2 billion merger allowed for shares of Cole, Inc. common stock to be exchanged for shares of American Realty common stock and/or cash pursuant to the terms of the Cole Merger Agreement, as set forth in the Cole Registration Statement/Proxy.  98% of Cole shareholders—including Plaintiffs here—received 1.0929 shares of American Realty common stock for each Cole share.

164.    That same day, American Realty issued a press release commenting on the closing of the Cole Merger entitled "American Realty Capital Properties Completes Acquisition of Cole Real Estate Investments Creating Largest Net Lease REIT" ("February 7, 2014 Press Release").

American Realty also filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the February 7, 2014 Press Release as an exhibit.  In the February 7, 2014 Press Release, Defendants extolled the virtues of the Cole Merger.  For example, Defendant Schorsch stated:

> With the closing of the Cole acquisition, *we have become one of the leading publicly traded REITs, and the dominant net lease REIT, 61% larger than the closest net lease competitor.* With the scale and advantages that come with being a $21.5 billion investment grade credit rated company, we expect to enjoy a significant cost of capital advantage. We intend to use this low cost, readily available capital to build out our portfolio and to attract and retain exceptional professionals.

165.    Defendant Kay added that:

> Following closing, the combination of our previously separate management teams provides us a powerful leadership core to firmly establish a solid foundation for the future. *With Cole in the fold, we will now focus further on de-levering our balance sheet, broadening our unencumbered asset pool and fine-tuning our duration matching, all this to further enhance the durability of our cash flows.*

166.    Former COO Lisa Beeson remarked that American Realty had grown "rapidly yet deliberately" and that through the Cole Merger, American Realty expected "to benefit from significant synergies, totaling approximately $70 million."  Defendant Block further stated that the Company reaffirmed its "2014 AFFO guidance range of $1.13 to $1.19 per share."

167.    The February 7, 2014 Press Release also highlighted several additional supposed "benefits" of the Cole Merger, including (1) Enhanced Scale and Competitiveness; (2) Increased Institutional Coverage and Ownership/Investment Grade Credit Rating; (3) Operational Efficiencies and Expense Reductions; and (4) Cost of Capital Advantage.  The release further highlighted that – in addition to Moody's – American Realty had now received an "investment grade credit rating from Standard & Poor's Rating Services."

168.    The statements referenced above in ¶¶141-67 were each materially false and misleading and omitted material facts when made.  The true facts were that:

(a)    Contrary to the statements referenced above in ¶¶147, 156, 158, 161, American Realty's internal accounting controls and procedures were insufficient to provide reasonable assurances regarding the reliability of American Realty's financial reporting and the preparation of its financial statements;

(b)    Contrary to the statements referenced above in ¶¶141-67, American Realty's financial statements were materially false and misleading as they did not accurately portray the Company's "faltering" financial performance and were not prepared in accordance with GAAP;

(c)    Contrary to the statements referenced above in ¶¶141-67, American Realty was not, as it represented in its financial statements, applying the "net" method of calculating AFFO.  Rather, the Company was intentionally and improperly adding back costs that were not associated with its ownership interest in the Operating Partnership;

(d)    Contrary to the statements referenced above in ¶¶141-67, American Realty's 2014 AFFO estimates were not accurate, attainable, honestly believed, or founded on a reasonable basis;

(e)    Contrary to the statements referenced above in ¶¶147, 156, 158, 161, the rapid pace of mergers and acquisitions during the Relevant Period, including the Cole Merger, exacerbated the deficiencies in American Realty's internal controls and financial reporting processes; and

(f)    Contrary to the statements referenced above in ¶¶141-67, American Realty's "growth by acquisition" strategy was not beneficial for American Realty shareholders,

but instead was designed to generate transaction fees for Schorsch-controlled companies and to result in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction.

### K.    Fourth Quarter And Year-End 2013 Financial Results

169.    On February 27, 2014, American Realty issued a press release announcing "Record Earnings of $163.9 Million and AFFO Per Share of $0.86 for 2013" ("Fourth Quarter 2013 Press Release").  That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit.  The release touted, among other things, record earnings and AFFO.  Specifically, American Realty announced AFFO of $55.8 million, a year-over-year increase of 153%, and AFFO per fully diluted share of $0.25, a year-over-year increase of 108%.  For the fiscal year ended 2013, the Company reported AFFO of $163.9 million, an increase of 240% from 2012, and AFFO per fully diluted share of $0.86, an increase of over 80% from 2012 and "Exceeding Consensus AFFO Estimates."  The Company also reiterated its full-year 2014 AFFO per share estimates of $1.13 to $1.19 per fully diluted share.

170.    In the Fourth Quarter 2013 Press Release, Defendant Schorsch commented that:

As these results unequivocally demonstrate, *we have accomplished an extraordinary amount in a very short time, underscoring our ability to execute key initiatives on every level across the organization.* We will complete over $1.0 billion of acquisitions during the first quarter, at a pace ahead of projections and accretive to our earnings.  *Our robust pipeline of property acquisitions, as well as other corporate opportunities we are privy to, is consistent with our ability to grow impressively, while staying true to our strategy*.

*             *             *

In addition to the strong growth we have seen with our earnings, American Realty's improved leverage posture and identified G&A synergies from the Cole acquisition are also generating a positive impact to the bottom line.  *Not only did we beat consensus estimates for the fourth quarter, our first quarter is off to a tremendous start.  When you compare these financial results to our peer group*

*valuation metrics, particularly dividend yield and earnings multiple, we believe our Company is undervalued and poised for a share price increase.*

171.    The Fourth Quarter 2013 Press Release also contained a statement from Defendant Block, who touted American Realty's annual results:

2013 proved to be *a record-setting year* for American Realty both in terms of earnings and growth, allowing us to beat consensus estimates. *Based on the strength of our self-originated acquisitions … we firmly believe that 2014 will be an even more impressive year. These factors should fortify our 2014 AFFO guidance of $1.13 to $1.19 per share … With strong AFFO per share growth, an attractive property portfolio, strong credit tenants bounded by long-term net leases and an attractively positioned balance sheet, we believe American Realty has the catalysts to provide long-term shareholder returns.*

172.    The Fourth Quarter 2013 Press Release also contained the following statement about AFFO and the Company's AFFO estimates:

**Funds from Operations and Adjusted Funds from Operations**

Funds from operations ("FFO") for the three months ended December 31, 2013, totaled $(93.2) million, or $(0.43) per share. FFO for this period includes one-time merger and other transaction related expenses of $111.7 million. FFO for the 12 months ended December 31, 2013 totaled $(249.5) million, or $(1.43) per fully diluted share. FFO for this period includes one-time merger and other transaction related expenses of $280.0 million. Excluding such one-time costs, FFO was $30.4 million, or $0.16 per share fully diluted. *Adjusted funds from operations ("AFFO") for the three months ended December 31, 2013, totaled $55.8 million, or $0.25 per fully diluted share. AFFO for the 12 months ended December 31, 2013 totaled $163.9 million, or $0.86 per share fully diluted.*

\*      \*      \*

**2014 Guidance**

In connection with the announcement of the Merger transaction, American Realty reiterated *2014 AFFO guidance from $1.13 to $1.19 per share*.

173.    The Fourth Quarter 2013 Press Release also contained language similar to that included in other press releases during the Relevant Period with respect to the importance of AFFO.  *See* ¶¶104, 125, 143, above.

174.     Also on February 27, 2014, American Realty filed with the SEC its annual report on Form 10-K for the year ended December 31, 2013 ("2013 Form 10-K").  The 2013 Form 10-K, which was signed by Defendants Schorsch, Block, Kay, McAlister, Michelson, Stanley, Bowman, Rendell, Andruskevich and Sealy, contained the same financial results and AFFO figures from the Fourth Quarter 2013 Press Release, and represented that those financial results were accurate and presented in accordance with GAAP.

175.     The 2013 Form 10-K also contained substantially similar statements about AFFO as compared to the Company's other public representations during the Relevant Period. Specifically:

> In this report, American Realty again discussed the importance of AFFO with regards to Company performance, stating: ***We consider FFO and AFFO useful indicators of the performance of a REIT***. Because FFO calculations exclude such factors as depreciation and amortization of real estate assets and gains or losses from sales of operating real estate assets (which can vary among owners of identical assets in similar conditions based on historical cost accounting and useful life estimates), they facilitate comparisons of operating performance between periods and between other REITs in our peer group. Accounting for real estate assets in accordance with U.S. GAAP implicitly assumes that the value of real estate assets diminishes predictably over time. Since real estate values have historically risen or fallen with market conditions, many industry investors and analysts have considered the presentation of operating results for real estate companies that use historical cost accounting to be insufficient by themselves.

176.     In addition, the Company provided the following table that quantified "items deducted or added to net loss in our calculation of FFO and AFFO for the years ended December 31, 2013, 2012 and 2011 and on a pro forma basis for the year ended December 31, 2013 (amounts in thousands)" and assured investors that the amounts listed were "***presented net of any non-controlling interest effect, where applicable***":

| | Year Ended December 31, | | | ARCP Pro Forma |
|---|---|---|---|---|
| | 2013 | 2012 | 2011 | |
| Net loss attributable to stockholders | $ (408,505) | $ (36,399) | $ (4,699) | $ 228,692 |
| (Gain) loss on held for sale properties | (14) | 800 | 815 | (55,941) |
| Depreciation and amortization | 156,871 | 60,700 | 2,111 | 604,679 |
| FFO | (248,548) | 1,801 | (1,773) | 778,970 |
| Acquisition related | 21,295 | 42,761 | 3,888 | — |
| Merger and other transaction related | 259,660 | 2,803 | — | — |
| (Gain) loss on investment securities | (44) | (154) | — | 3,537 |
| Loss on derivative instruments, net | 67,357 | — | 2 | 69,111 |
| Interest on convertible obligation to preferred investors | 18,802 | — | — | — |
| Interest premiums and discounts on debt, and settlement of convertible obligation to preferred investors | 12,872 | — | — | 11,843 |
| Amortization of above- and below-market lease assets and liabilities | (348) | 108 | — | 2,744 |
| Amortization of deferred financing costs | 11,183 | 1,885 | 188 | 18,473 |
| Straight-line rent | (8,791) | (3,345) | (239) | (65,847) |
| Non-cash equity compensation expense | 34,835 | 1,391 | 191 | 34,935 |
| Operating fees to affiliates | 5,654 | 212 | — | $ 63,082 |
| AFFO | $ 163,915 | $ 48,082 | $ 2,255 | $ 913,788 |

177.     Specifically, the table represented that AFFO was $163,915,000 for the year ended December 31, 2013, compared to $48,082,000 for the year ended December 31, 2012.

178.     Note 3 to the 2013 Form 10-K, which was entitled "Summary of Significant Accounting Policies," represented that American Realty's financial statements were "prepared on the accrual basis of accounting in accordance with U.S. GAAP."

179.     Defendants also stated the following with respect to the Company's internal controls and procedures:

> In accordance with Rules 13a-15(b) and 15d-15(b) of the Exchange Act, management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded, as of the end of such period, that our disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by us in our reports that we file or submit under the Exchange Act.
>
> **Management's Annual Report on Internal Control over Financial Reporting**
>
> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under

the Securities Exchange Act of 1934, as amended. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with generally accepted accounting principles.

\*       \*       \*

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2013. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in the 1992 Internal Control-Integrated Framework.

**Based on our assessment, our management believes that, as of December 31, 2013, our internal control over financial reporting is effective.**

180.     The 2013 Form 10-K also contained the same internal disclosure controls Certifications and SOX Certifications that were included with American Realty's Form 10-Qs filed during the Relevant Period.  *See* ¶¶108-9, 129, 147, above.  Again, Defendants Schorsch and Block signed the Certifications which provided, among other things, that Defendants Schorsch and Block had reviewed the 2013 Form 10-K and that it contained no materially untrue statements or omissions; fairly represented in all material respects the financial condition of American Realty; was accurate in all material respects; and disclosed any material changes to the Company's internal control over financial reporting.

181.     After the market closed, Defendants held a conference call to discuss the Company's fourth quarter of 2013 results.  During the conference call, Defendant Block stated:

We are very pleased to be sharing such impressive results for 2013 and the beginning of 2014… **Our AFFO improved more than 240% to approximately $164 million, producing a 70% increase of AFFO per share on a fully diluted basis to $0.86. The strength of our AFFO is directly related to our investing $3.4 billion in 676 new real estate properties, and the closing and successful integration of the $2.3 billion acquisition of ARCT Trust III, the $2.2 billion acquisition of CapLease, and the $774 million acquisition of the GE Trust REIT portfolio. … [W]e comfortably affirm our 2014 AFFO guidance of $1.13 to $1.19 per share.**

182. Additionally, the following exchange regarding the transaction took place between analyst Chris Lucas of Capital One Securities and Defendant Block about the Company's full-year 2014 AFFO estimates:

**Analyst Lucas**: And then, again related to guidance, Brian, just in terms of getting to the low end of the numbers we should just assume that $1.13 at the low end is reflective of just essentially what you talked about before, which is what's done and nothing more?  Is that effectively how we should be thinking about the low end?

**Defendant Block**: That's correct.  To repeat Chris, if we didn't do anything past March 31, we would be at the low end of the range, notwithstanding the fact that we have a lot more acquisition potential for the duration of the year.

183. Also during the call, Lisa Beeson touted American Realty's "acquisition machine" in the following exchange with analyst Josh Patinkin of BMO Capital Markets:

**Analyst Patinkin**: Okay. And is that, you think, what enabled you such an attractive initial yield, going into smaller deal size?

**Beeson**: Absolutely.  That is how we distinguish ourselves.  ***No other company has the acquisition machine that we have built here***, that enables us to cost effectively do smaller one-off transactions, and that's how we're able to get the pricing differential.  We can buy three assets at a 7.75% or an 8% cap that another competitor buys in a portfolio at a 6, 7% cap.  That's a significant spread differential, and we do that because we're able to, and we'll do granular level acquisitions.

184. The statements referenced above in ¶¶169-83 were each materially false and misleading and omitted material facts when made.  The true facts were that:

(a) Contrary to the statements referenced above in ¶¶169-83, American Realty's financial statements were materially false and misleading as they did not accurately portray the Company's financial performance.  Specifically, American Realty reported that its AFFO for the year ending December 31, 2013, was $163,915,000.  Defendants have admitted, however, that the reported AFFO figure was materially inflated, including because American Realty improperly added back expenses associated with 100% of the equity interests in the

Operating Partnership.  Defendants have admitted that, as a result, American Realty's 2013 Form 10-K, and the Company's earnings releases and other financial communications for this period, "should no longer be relied upon";

(b)     Contrary to the statements referenced above in ¶¶169-83, American Realty's 2014 AFFO estimates were not accurate, attainable, honestly believed, or founded on a reasonable basis;

(c)     Contrary to the statements referenced above in ¶¶179-80, American Realty's internal accounting controls and procedures were insufficient to provide reasonable assurances regarding the reliability of American Realty's financial reporting and the preparation of its financial statements;

(d)     Contrary to the statements referenced above in ¶¶179-80, the rapid pace of mergers and acquisitions during the Relevant Period, including the Cole Merger, exacerbated the deficiencies in American Realty's internal controls and financial reporting processes; and

(e)     Contrary to the statements referenced above in ¶¶169-83, American Realty's "growth by acquisition" strategy was not beneficial for American Realty shareholders, but instead was designed to generate transaction fees for Schorsch-controlled companies and to result in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction; and

(f)     Contrary to the statements referenced above in ¶170, Defendants' statement that the Company was "undervalued" was based on inflated AFFO numbers that were only possible through manipulation and falsification of American Realty's actual performance.

### L.    Grant Thornton's Audit Opinion

185.    The 2013 Form 10-K included the following unqualified audit opinion from Grant Thornton related to American Realty's 2013 financial statements and American Realty's system of internal controls over financial reporting:

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors and Stockholders
American Realty Capital Properties, Inc.

We have audited the accompanying consolidated balance sheets of American Realty Capital Properties, Inc. (a Maryland corporation) and subsidiaries (the "Company") as of December 31, 2013 and 2012, and the related consolidated statements of operations and comprehensive loss, changes in equity, and cash flows for each of the three years in the period ended December 31, 2013.  Our audits of the basic consolidated financial statements included the financial statement schedules listed in the index. These financial statements and financial statement schedules are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and financial statement schedules based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of American Realty Capital Properties, Inc. and subsidiaries as of December 31, 2013 and 2012, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2013 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the related financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over

financial reporting as of December 31, 2013, based on criteria established in the 1992 *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 27, 2014 expressed an unqualified opinion.

186.    The unqualified audit opinion was materially false and misleading because, as detailed herein:

(a)    American Realty's 2013 financial statements violated GAAP;

(b)    The related financial statement schedules did not present "fairly, in all material respects, the information set forth therein";

(c)    Material deficiencies existed in American Realty's internal control over financial reporting; and

(d)    Grant Thornton's audit of the FY 2013 financial statements was not conducted in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB").

187.    Auditing standards have been established to ensure that external auditors fulfill their obligations when auditing and reviewing financial statements and other information contained in SEC filings. These standards include those originally established by the American Institute of Certified Public Accountants ("AICPA"), which include, *inter alia*, ten basic standards that establish the objectives of an audit and provide guidance for the quality of audit procedures, as well as interpretations of these standards.   Additionally, as the result of the Sarbanes-Oxley Act of 2002, the PCAOB was created to oversee the audits of public companies. Subsequent to its creation, the PCAOB now adopted, amended and expanded on the AICPA auditing standards and has also promulgated additional auditing standards.

188.     The PCAOB's AS No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, identifies the following as indicators of material weakness(es) in a company's system of internal control:

- the identification of fraud, whether or not material, on the part of senior management; and
- a restatement of previously issued financial statements to reflect the correction of a material misstatement.

These indicators, which the Defendants have admitted were present during the Relevant Period, demonstrate that material weaknesses existed in American Realty's system of internal control as of December 31, 2013.

189.     Grant Thornton's knowledge of American Realty's transactions and related parties created obligations under the auditing standards that it failed to meet.  AS No. 15, *Audit Evidence*, provides that an auditor has a reasonable basis for issuing an audit opinion only when it has planned and performed audit procedures in a manner that enables it to obtain "sufficient appropriate audit evidence." AS No. 5 defines "sufficiency" as "the measure of the quantity of audit evidence" and appropriateness as "the measure of the quality of audit evidence."   In addition, AS No. 14, *Evaluating Audit Results*, provides that, when evaluating whether the financial statements are free of material misstatements, the auditor should evaluate the qualitative aspects of the company's accounting practices, including potential bias in management's judgments about the amounts and disclosures in the financial statements.  Further, AU § 334, *Related Parties*, notes that the auditor "should place emphasis on testing material transactions with parties he knows are related to the reporting entity" and "apply the procedures [the auditor] considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements."

190.    Had Grant Thornton followed PCAOB standards, it would have learned that American Realty's 2013 financial statements were not presented in conformity with GAAP. Accordingly, Grant Thornton failed to obtain sufficient appropriate audit evidence as required by applicable auditing standards, including those associated with related parties.

191.    Grant Thornton violated, at least, the following auditing standards when examining American Realty's 2013 financial statements:

- Generally Accepted Auditing Standards ("GAAS") Standard of Reporting No. 1, which requires the audit report to state whether the financial statements are presented in accordance with GAAP;

- AS No. 8, *Audit Risk*, which provides that to form an appropriate basis for expressing an opinion on the financial statements, the auditor must plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement due to error or fraud; and

- AU §220, *Independence*, which requires that independence in mental attitude is to be maintained by the auditor in all matters related to the audit.

192.    In certifying American Realty's 2013 financial statements, Grant Thornton represented that its audit was performed in accordance with each of the above auditing standards, when it was not. Accordingly, the representations in Grant Thornton's audit opinion were both objectively false and could not have been believed at the time they were rendered.

193.    As Defendant McAlister has explained, she informed Grant Thornton's audit manager assigned to the 2013 financial statements that American Realty had been engaging in deceptive accounting practices **prior to** the Company's filing of the Second Quarter 2014 Form 10-Q.  PCAOB standards, including AU §561, *Subsequent Discovery of Facts Existing at the Date of the Auditor's Report*, provide that when the auditor becomes aware of information that would have been investigated had it been known prior to issuing the audit report, the auditor is obligated to investigate its reliability and whether it existed at the date of its report.  If the financial statements or the auditor's report would have been affected, and it is believed there are

persons currently relying or likely to rely on the financial statements, the auditor must advise the client to make appropriate disclosure of the new facts.  If the client refuses, the auditor must take appropriate action, including notifying appropriate regulatory agencies.

194.    Apart from these PCAOB standards, Section 10A of the Exchange Act requires:

…

(2) Response to failure to take remedial action

If, after determining that the audit committee of the board of directors of the issuer, or the board of directors of the issuer in the absence of an audit committee, is adequately informed with respect to illegal acts that have been detected or have otherwise come to the attention of the firm in the course of the audit of such firm, the registered public accounting firm concludes that–

(A) the illegal act has a material effect on the financial statements of the issuer;

(B) the senior management has not taken, and the board of directors has not caused senior management to take, timely and appropriate remedial actions with respect to the illegal act; and

(C) the failure to take remedial action is reasonably expected to warrant departure from a standard report of the auditor, when made, or warrant resignation from the audit engagement; the registered public accounting firm shall, as soon as practicable, directly report its conclusions to the board of directors.

(3) Notice to Commission; response to failure to notify

An issuer whose board of directors receives a report under paragraph (2) shall inform the Commission by notice not later than 1 business day after the receipt of such report and shall furnish the registered public accounting firm making such report with a copy of the notice furnished to the Commission. If the registered public accounting firm fails to receive a copy of the notice before the expiration of the required 1-business-day period, the registered public accounting firm shall–

(A) resign from the engagement; or

(B) furnish to the Commission a copy of its report (or the documentation of any oral report given) not later than 1 business day following such failure to receive notice.

195.    As set forth in Defendant McAlister's verified complaint, Grant Thornton was aware of American Realty's accounting fraud prior to July 29, 2014, when the Company filed the Second Quarter 2014 Form 10-Q.  Even so, there is no indication that Grant Thornton notified American Realty's Board of Directors about such improprieties, as required by PCAOB

standards and Section 10A of the Exchange Act.  To the contrary, according to the Company's October 29, 2014 press release, American Realty's Board of Directors was not notified of the Company's deceptive accounting practices until September 7, 2014.

196.   Additionally, notwithstanding American Realty's admission that the Company's Fiscal Year 2013 financial statements should not be relied upon and that the Company engaged in deceptive accounting, Grant Thornton has not withdrawn its false and misleading audit opinion.

### M.   First Quarter 2014 Financial Results

197.   On May 8, 2014, American Realty issued a press release announcing "Record First Quarter 2014 Operating Results" ("First Quarter 2014 Press Release").  That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit.   The press release announced AFFO available to common stockholders of $147.4 million, or $0.26 per diluted share, representing a year-over-year increase of 334.6%.  American Realty reaffirmed its full-year 2014 AFFO estimates of $1.13 to $1.19 per diluted share.

198.   The First Quarter 2014 Press Release contained the following statement from Defendant Schorsch regarding the Company's financial results:

> We had a record quarter with earnings **coming exactly in line with our expectations of $0.26 AFFO per share**, consistent with our previously stated guidance for the year.  Additionally, our year-to-date acquisitions, combined with properties currently under contract puts us well-ahead of schedule to achieve our total 2014 annual acquisition targets by midyear. With our strengthened balance sheet, and the Company ready to capitalize on a number of large-scale sale-leaseback transactions, **we are in position to deliver strong shareholder return this year** …

199.   Likewise, Defendant Kay represented:

> …every aspect of our business is exceeding our expectations … With strong earnings, our acquisition volume is outpacing our guidance, our cap rates surpass all industry peers, Cole Capital launched two new products, and we successfully

integrated our management and systems, all of which is allowing us to execute with a disciplined intensity.

200.    The First Quarter 2014 Press Release also contained language similar to that included in other press releases during the Relevant Period with respect to the importance of AFFO.  *See, e.g.,* ¶¶104, 125, 143, 173, above.

201.    Also on May 8, 2014, American Realty filed with the SEC its Form 10-Q for the quarter ended March 31, 2014 ("First Quarter 2014 Form 10-Q").  The First Quarter 2014 Form 10-Q was signed by Defendants Schorsch and Block, contained the same financial results and reported AFFO from the First Quarter 2014 Press Release, and represented that those financial results were accurate and presented in accordance with GAAP.  The First Quarter 2014 Form 10-Q also contained substantially similar statements about AFFO as compared to the other Form 10-Qs during the Relevant Period.  *See, e.g.,* ¶¶104-5, 126, 144, above.  Notably, although she signed the 2013 Form 10-K and the Second Quarter 2014 Form 10-Q, Defendant McAlister did not sign the First Quarter 2014 Form 10-Q.

202.    In addition, the Company provided the following table that quantified "the items deducted or added to net loss in our calculation of FFO and AFFO for the three months ended

March 31, 2014 and 2013 (in thousands)" and assured investors that the amounts listed were

"*presented net of any non-controlling interest effect where applicable*":

| | Three Months Ended March 31, | |
| | 2014 | 2013 |
|---|---|---|
| Net loss attributable to stockholders (in accordance with U.S. GAAP) | $ (332,313) | $ (141,163) |
| Gain on disposition of property | (2,979) | — |
| Depreciation and amortization of real estate assets | 150,899 | 26,731 |
| Depreciation and amortization of real estate assets in unconsolidated joint ventures | 602 | — |
| FFO | (183,791) | (114,432) |
| | | |
| Acquisition related | 11,884 | 10,327 |
| Merger and other transaction related | 222,192 | 137,769 |
| Gain on investment securities | — | (451) |
| Loss on derivative instruments, net | 20,197 | 5 |
| Amortization of premiums and discounts on debt and investments | (18,325) | — |
| Dividends attributable to convertible preferred shares | 5,053 | — |
| Dividends attributable to participating securities | 936 | — |
| Amortization of above- and below-market lease assets and liabilities, net | 358 | 68 |
| Amortization of deferred financing costs | 37,940 | 1,243 |
| Other amortization and depreciation | 14,374 | 22 |
| Loss on early extinguishment of debt | 20,819 | — |
| Straight-line rent | (7,520) | (1,510) |
| Non-cash equity compensation expense | 22,510 | 881 |
| Proportionate share of adjustments for unconsolidated joint ventures | 762 | — |
| AFFO | $ 147,389 | $ 33,922 |

203.    Specifically, the table represented that AFFO was $147,389,000 for the three-month period ended March 31, 2014, compared to $33,922,000 for the three-month period ended March 31, 2013.

204.    Note 3 to the Third Quarter 2013 Form 10-Q, which was entitled "Summary of Significant Accounting Policies," represented that American Realty's financial statements "were prepared in conformity with U.S. GAAP" and that they included "all adjustments and accruals of a normal recurring nature, which, in the opinion of management, are necessary for a fair presentation of results for the interim periods."

205.    The First Quarter 2014 Form 10-Q also contained the same internal disclosure controls Certifications and SOX Certifications that were included with American Realty's other

Form 10-Qs filed during the Relevant Period.  *See, e.g.,* ¶¶108-9, 129, 147, 180, above.  Again, Defendants Schorsch and Block signed the Certifications.

206.    Later on May 8, 2014, American Realty held a conference call to discuss the Company's first quarter 2014 financial results.  During the call, Defendant Schorsch stated: "Our first quarter earnings came in exactly where we expected, at $0.26 per share of AFFO," and reiterated that "[w]e are confident with our guidance for the full year of 2014 of $1.13 to $1.19 per share, and a forward quarterly run rate of $0.29 to $0.30 per share. . . ."  Likewise, Defendant Block noted that the first quarter 2014 AFFO was $0.26 per share, fully diluted, and that the Company's "current run rate based on AFFO per share fully diluted is between $0.29 and $0.30."  Following his prepared remarks, Defendant Schorsch stated that investors should buy American Realty stock as "we're way undervalued."  Defendant Schorsch further emphasized that "our stock is cheap."

207.    The statements referenced above in ¶¶197-206 were each false and misleading and omitted material facts when made.  The true facts were that:

(a)    American Realty's financial statements referenced above in ¶¶197-206 were materially false and misleading as they did not accurately portray the Company's financial performance.  Specifically, American Realty reported that its AFFO available to common stockholders was $147.4 million.  As confirmed by Defendants' admissions, however, that figure was inflated, including because American Realty improperly added back expenses associated with 100% of the equity interests in the Operating Partnership.  As the Company later admitted, first quarter 2014 AFFO was overstated by an estimated $17,638,000 on a net basis (or $11,974,000 on a gross basis).  Indeed, Defendants have admitted that, as a result, American

Realty's Form 10-K for the quarter ended March 31, 2014, and the Company's earnings releases and other financial communications for this period, "should no longer be relied upon";

(b)     Contrary to the statements referenced above in ¶¶197-206, American Realty's 2014 AFFO estimates were not accurate, attainable, honestly believed, or founded on a reasonable basis;

(c)     Contrary to the statements referenced above in ¶205, American Realty's internal accounting controls and procedures were insufficient to provide reasonable assurances regarding the reliability of American Realty's financial reporting and the preparation of its financial statements;

(d)     Contrary to the statements referenced above in ¶¶197-206, the rapid pace of mergers and acquisitions during the Relevant Period, including the Cole Merger, exacerbated the deficiencies in American Realty's internal controls and financial reporting processes;

(e)     Contrary to the statements referenced above in ¶205, American Realty's "growth by acquisition" strategy was not beneficial for American Realty shareholders, but instead was designed to generate transaction fees for Schorsch-controlled companies and to result in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction; and

(f)     Defendants' statement above in ¶206 that the Company was "way undervalued" was based on inflated AFFO numbers that were only possible through manipulation and falsification of American Realty's actual performance.

### N.     May 21, 2014 Stock Offering

208.     On March 14, 2013, American Realty filed a Form S-3ASR ("Shelf Registration Statement") with the SEC.  According to the Shelf Registration Statement, certain documents filed with the SEC were incorporated by reference:

[A]ny reports filed by [American Realty] with the SEC after the date of this [statement] and before the date that the offering of securities by means of this prospectus is terminated will automatically update and, where applicable, supersede any information contained in this [statement] or incorporated by reference into this [statement].

*          *          *

All documents that [American Realty] file[s] (but not those that we furnish) pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, or the Exchange Act, after the date of the initial registration statement of which this prospectus is a part and prior to the effectiveness of the registration statement . . . .

*          *          *

All documents that [American Realty] file[s] (but not those that we furnish) pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act on or after the date of this prospectus and prior to the termination of the offering of any of the securities covered under this prospectus . . . .

209.    The documents filed with the SEC that were incorporated by reference in the Shelf Registration Statement included American Realty's annual and quarterly financial statements on Forms 10-K and 10-Q, as well as the Company's offering materials identified herein.  The Shelf Registration Statement was signed by Defendants Schorsch, Block, Kahane, Rendell, Michelson, and Bowman.

210.    On May 21, 2014, American Realty issued the May 2014 Stock Offering Press Release, which announced the issuance of 100 million shares of newly issued American Realty stock. That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit.  The May 2014 Offering Documents incorporated by reference American Realty's 2013 Form 10-K and its First Quarter 2014 Form 10-Q.

211.    The statements referenced above in ¶¶208-10 were each materially false and misleading and omitted material facts when made.  The true facts were that:

(a)      American Realty's financial statements referenced above in ¶¶208-10 were materially false and misleading as they did not accurately portray the Company's financial performance.  Specifically, the AFFO that American Realty reported in its 2013 Form 10-K and its First Quarter 2014 Form 10-Q were inflated because American Realty improperly added back expenses associated with 100% of the equity interests in the Operating Partnership.   As the Company later admitted, the 2013 Form 10-K and the First Quarter 2014 Form 10-Q, along with other earnings releases and financial communications from those periods, "should no longer be relied upon";

(b)      Contrary to the statements referenced above in ¶¶208-10, American Realty's 2014 AFFO estimates were not accurate, attainable, honestly believed, or founded on a reasonable basis;

(c)      Contrary to the statements referenced above in ¶209, American Realty's internal accounting controls and procedures were insufficient to provide reasonable assurances regarding the reliability of American Realty's financial reporting and the preparation of its financial statements;

(d)      Contrary to the statements referenced above in ¶209, the rapid pace of mergers and acquisitions during the Relevant Period, including the Cole Merger, exacerbated the deficiencies in American Realty's internal controls and financial reporting processes; and

(e)      Contrary to the statements referenced above in ¶¶208-10, American Realty's "growth by acquisition" strategy was not beneficial for American Realty shareholders, but instead was designed to generate transaction fees for Schorsch-controlled companies and to result in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction.

### O.      Second Quarter 2014 Financial Results

212.     On July 29, 2014, American Realty issued a press release for the second quarter of 2014 ("Second Quarter 2014 Press Release").  That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit.  The release announced AFFO of $205.3 million, representing a year-over-year increase of 429.0%, and AFFO per diluted share of $0.24, representing a year-over-year increase of 26%.  The Company also reported a net loss of $63.4 million, or $0.08 per share.  The Company also reported a "[p]ro forma normalized estimated AFFO run rate as of year-end 2014 of $1.18-$1.20 per share including 2014 completed and announced transactions."

213.     The Second Quarter 2014 Press Release contained the following statement from Defendant Schorsch regarding the Company's financial results:

> … *I have continued to focus my attention on improving corporate governance … With the support of our Board of Directors, we are improving our practices by eliminating related party transactions, enhancing disclosures, evaluating executive compensation, opting out of the MUTA to assure our stockholders' right to elect the entire Board at each annual meeting, and implementing other policies designed to improve our reporting and transparency, further align interest with our stockholders, and eliminate potential conflicts of interest. Our goal is to constantly improve our corporate governance, which we expect will ultimately be reflected in our corporate governance scores. All of these efforts are taken with a view toward creating long-term value for stockholders.*

214.     Likewise, Defendant Kay stated that American Realty was purportedly well-positioned to continue to provide value to its shareholders:

> Our second quarter results and accomplishments are indicative of our focus on driving long-term value by delivering on our commitments … In six months, we have fully integrated the organization, achieved $38.0 million of the $77.0 million of cost synergies to come in the first year, reduced leverage, de-risked the balance sheet, lengthened debt maturities, created $11.8 billion of unencumbered assets and significantly extended and upsized our credit facility. With these actions undertaken and the formative stage of the company behind us, we are focused on the day-to-day operations of the company. *Through all of these undertakings, we are positioned for long-term success.*

Our balance sheet acquisitions in the quarter, owned and under contract, of 1,217 properties in over 210 separate transactions demonstrates the continuing systematic execution of our core acquisition strategy and testifies to the repeatability of our investment process.

*         *         *

**_The daily execution of these collective actions allows us to maintain our 2014 AFFO per share guidance of $1.13 - $1.19, while significantly de-levering the balance sheet and maximizing value for our stockholders._**

215.    The Second Quarter 2014 Press Release also contained language similar to that included in other press releases during the Relevant Period with respect to the importance of AFFO.  *See, e.g.,* ¶¶104, 125, 143, 173, above.

216.    Also on July 29, 2014, American Realty filed with the SEC its Form 10-Q for the quarter ended June 30, 2014 ("Second Quarter 2014 Form 10-Q").  The Second Quarter 2014 Form 10-Q was signed by Defendants Schorsch, Block and McAlister, contained the same financial results and AFFO figures from the Second Quarter 2014 Press Release, and represented that those financial results were accurate and presented in accordance with GAAP.  The Second Quarter 2014 Form 10-Q also contained substantially similar statements about AFFO as compared to the other Form 10-Qs during the Relevant Period.  *See, e.g.,* ¶¶104-5, 126, 144, above.

217.    In addition, the Company provided the following table that quantified "the items deducted or added to net loss in our calculation of FFO and AFFO for the three months ended June 30, 2014 and 2013 (in thousands)":

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2014 | 2013 | 2014 | 2013 |
| Net loss (in accordance with U.S. GAAP) | $ (43,265) | $ (72,433) | $ (363,920) | $ (214,028) |
| Dividends on Series F Preferred Stock | (17,773) | — | (35,416) | — |
| Adjusted net loss | (61,038) | (72,433) | (399,336) | (214,028) |
| Gain on disposition of property | (1,510) | — | (4,489) | (14) |
| Depreciation and amortization of real estate assets | 234,089 | 33,811 | 384,988 | 60,564 |
| Depreciation and amortization of real estate assets in unconsolidated entities | 3,120 | — | 3,722 | — |
| FFO | 174,661 | (38,622) | (15,115) | (153,478) |
| Acquisition related | 8,453 | 37,119 | 20,337 | 47,446 |
| Merger and other transaction related | 13,286 | 6,393 | 235,478 | 144,162 |
| Gain on investment securities | — | — | — | (451) |
| (Gain) loss on derivative instruments, net | (21,926) | 31,174 | (1,729) | 31,179 |
| Amortization of premiums and discounts on debt and investments | (3,487) | — | (21,812) | — |
| Amortization of above- and below-market lease assets and liabilities, net | 2,133 | 68 | 2,491 | 136 |
| Net direct financing lease adjustments | 136 | — | 527 | — |
| Amortization and write off of deferred financing costs | 11,342 | 2,271 | 61,256 | 3,514 |
| Other amortization and depreciation | 24,750 | — | 39,124 | — |
| Loss on early extinguishment of debt | 3,985 | — | 24,804 | — |
| Straight-line rent | (17,413) | (3,059) | (24,933) | (4,568) |
| Non-cash equity compensation expense | 9,338 | 3,458 | 31,848 | 4,339 |
| Proportionate share of adjustments for unconsolidated joint ventures | 20 | — | 782 | — |
| AFFO | $ 205,278 | $ 38,802 | $ 353,058 | $ 72,279 |

218.    Specifically, the table represented that AFFO was $205,278,000 and $353,058,000 for the three and six month periods ended June 30, 2014, respectively, compared to $38,802,000 and $72,279,000 for the three and six month periods ended June 30, 2013, respectively.  Notably, American Realty disclosed to investors for the first time that it was calculating AFFO on a gross, rather than a net basis.

219.    Note 3 to the Second Quarter 2014 Form 10-Q, which was entitled "Summary of Significant Accounting Policies," represented that American Realty's financial statements "were prepared in conformity with U.S. GAAP" and that they included "all adjustments and accruals of

a normal recurring nature, which, in the opinion of management, are necessary for a fair presentation of results for the interim periods."

220.   The Second Quarter 2014 Form 10-Q also contained the same internal disclosure controls Certifications and SOX Certifications that were included with American Realty's other Form 10-Qs filed during the Relevant Period.  *See, e.g.,* ¶¶108-9, 129, 147, 180, above.  Again, Defendants Schorsch and Block signed the Certifications.

221.   Later on July 29, 2014, American Realty held a conference call to discuss the Company's second quarter 2014 financial results.  During the call, Defendant Kay stated:

I could not be more excited about my senior management team and the future prospects of this Company. ***From afar, it may appear at times our rapid growth is hard to understand. I can assure you, however, that everything we do is directed towards a singular objective: to create value for our shareholders.***

***So why am I excited? I can tell you that it has a lot to do with our people, our culture, the opportunities we see in the marketplace, and our competitive advantages.*** Today we have roughly $30 billion of assets managed by more than 425 talented people located strategically throughout the country. We have built this Company with the future in mind and we are well positioned to take advantage of market opportunities as they arise.

\*         \*         \*

For example, I am often asked, how can a company of our size consistently invest in properties at cap rates meaningfully better than our competitors. There is no alchemy here, I assure you. In part, our ability to invest at prices better than our peer group's results from our origination team being the largest in the industry.

\*         \*         \*

I would like to talk about the equity offering we completed this quarter. I am pleased that we raised the money and deleveraged the balance sheet. With plenty of uncertainty in the global economy, heading into the summer reducing our leverage was the right choice, although not the most popular choice.

\*         \*         \*

***American Realty is positioned for success. It is now not about creating this foundation, but building upon it. I could not be more excited about the prospects for this Company and I look forward to our future together.***

222.    Defendant Block commented on American Realty's second quarter 2014 financial performance and AFFO guidance, stating, in relevant part:

Our second-quarter results are in line with our expectations. . . . ***AFFO was $198.6 million, or $0.24 per fully diluted share, which represents a 26% increase from this period last year. We are confident with our [AFFO] guidance range for the full year of 2014 of $1.13 to $1.19 per share. . . .***

\*       \*       \*

Additionally, our internal operations continue[] to strengthen.  The synergy created by the integration of the Cole team and the adoption of new technology has allowed us to be more timely and efficient in our financial reporting. In fact, this enhanced scale allowed us to move up the timing of our 10-Q filing and earnings call as a result of these improvements by roughly a week.

Let me turn to our earnings guidance numbers … The second-half estimated AFFO projected run rate of $533 million . . . includes second quarter as well as G&A for the second half of the year of approximately $80 million, which is inclusive of commissions and cost synergies.  This is consistent with our full-year estimate of total G&A, including noncash compensation of approximately $176 million.  The run rate AFFO also includes an estimate for Cole Capital based on our projected $3.1 billion of capital raise and $4.9 billion of acquisitions into the managed funds. The projection results in AFFO for Cole Capital for the full year of approximately $120 million.

223.    On the call, the following exchange related to AFFO and AFFO guidance took place between an analyst Dan Donlan of Ladenburg Thalmann and Defendant Kay:

**Analyst Dolan**:  David, just wanted to go to the guidance of a quick just so I understand it. The pro forma AFFO run rate at year-end 2014, you have $1.18 to $1.20, that implies a quarterly run rate of $0.295 to $0.30.  That's not a run rate for the fourth quarter, is it?  Is that what it would be, call it, at the very end of the quarter for the first quarter assuming – for the first quarter of 2015 assuming nothing new to 2015.  Is that right?

**Defendant Kay**:  That is correct. Other than for Cole Capital that would assume the same estimates for 2015 as we have estimated for 2014. So yes, that would be a year-end run rate but would assume the same $4.9 billion of assets acquired during 2015 as well as the same $3.1 billion of equity raised in the Cole Capital managed funds.

\*       \*       \*

**Analyst Dolan**: If I am looking at the other guidance range that you reiterated, the one ***for the full-year 2014 of $1.13 to $1.19*** I think, ***the midpoint of that is $1.16***.

85

So you have done $0.49 year to date. ***That would imply about $0.335 in the third quarter and fourth quarter to get to that midpoint – is that right as well?***

**Defendant Kay**:  That is roughly, yes, the math. And the reason there being is again, most of the Cole Capital EBITDA will occur with the acquisitions in the capital (inaudible) in Cole Capital versus where we were the first two quarters of the year. It is a very steep ramp up, as you know.

**Analyst Dolan**: Yes, yes. And so you probably have some benefit from ARCM not getting full potentially until the first part of the fourth quarter as well.

**Defendant Kay**:  That is exactly right. Because as articulated in that and part of the reason why we really wanted to lay that out is because you will have Red Lobster and ARCenters being owned for the three-month period, roughly, both at the same time. And that is why we tried to be transparent and give both numbers – give the AFFO run rate so that you will see the difference of actually Centers coming out as well as the year with both Centers and Lobster in at the same period of time.

*       *       *

Just to note, one other thing also in the estimates there is no promote or one-time disposition fees in any of the Cole numbers either in the AFFO run rate that we gave of $1.18 to $1.20 or in the $1.13 to $1.19 range where we reconciled to $1.14.

224.    The statements referenced above in ¶¶212-23 were each materially false and misleading and omitted material facts when made.  The true facts were that:

(a)     American Realty's financial statements referenced in ¶¶212-23 were materially false and misleading as they did not accurately portray the Company's financial performance.  Specifically, as to the second quarter of 2014, American Realty reported that AFFO was $205,278,000 and $353,058,000 for the three and six month periods ended June 30, 2014, respectively.  Defendants have since admitted, however, that these figures are inflated because, among other things, American Realty improperly added back expenses associated with 100% of the equity interests in the Operating Partnership.  This, in turn, caused American Realty's net loss to be understated for the three and six months ended June 30, 2014.  Indeed, Defendants have admitted that, as a result, American Realty's financial statements for the three

and six month periods ended June 30, 2014, along with other earnings releases and financial communications for these periods, "should no longer be relied upon";

(b)     Contrary to the statements referenced above in ¶¶212-23, American Realty's 2014 AFFO estimates were not accurate, attainable, honestly believed, or founded on a reasonable basis;

(c)     Contrary to the statements referenced above in ¶220, American Realty's internal accounting controls and procedures were insufficient to provide reasonable assurances regarding the reliability of American Realty's financial reporting and the preparation of its financial statements;

(d)     Contrary to the statement referenced above in ¶220, the deficiencies in American Realty's operations did not "continue[] to strengthen" during the Relevant Period. Rather, the Company's rapid pace of mergers and acquisitions during the Relevant Period, including the Cole Merger, exacerbated the deficiencies in American Realty's internal controls and financial reporting processes; and

(e)     Contrary to the statements referenced above in ¶¶212-23, American Realty's "growth by acquisition" strategy was not beneficial for American Realty shareholders, but instead was designed to generate transaction fees for Schorsch-controlled companies and to result in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction.

## VII.    AMERICAN REALTY VIOLATED GAAP AND SEC RULES

225.    As discussed above, throughout the Relevant Period, American Realty's periodic financial statements with the SEC represented that American Realty's financials were prepared in accordance with GAAP.  Financial statements filed with the SEC are presumed to be misleading and inaccurate if they have not been prepared in conformity with GAAP.  *See* Regulation S-X, 17

C.F.R. § 210.4-01.(a)(1). This presumption also exists for interim financial statements filed with the SEC. *See* 17 C.F.R. § 210.10-01.

226.    American Realty has admitted that it failed to record approximately $10.5 million in "certain expenses," which caused the reported net loss attributable to the Company for the quarter ended June 30, 2014 to be understated by 18.6%.

227.    American Realty's financial statements during the Relevant Period violated GAAP (and certain of the Company's critical accounting policies), in numerous ways, including by failing to (i) record expenses in conformity with ASC Topic 450; (ii) disclose related party transactions in conformity with ASC Topic 850; and (iii) timely record asset impairments in conformity with ASC Topic 360.

228.    The Company's Forms 10-K and 10-Q were also materially false and misleading because they failed to, as required by Item 303 of Regulation S-K, disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations.

## VIII.   <u>NO SAFE HARBOR</u>

229.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint.   The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.   Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

230.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of American Realty who knew that the statement was materially false or misleading when made.

IX.    **PLAINTIFFS' RELIANCE**

231.    During the Relevant Period, Plaintiffs relied on the materially false and misleading statements alleged herein when purchasing American Realty common stock.

232.    There is a presumption of reliance established by the fraud-on-the-market doctrine in this case because, among other things:

(a)    The Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

(b)    The misrepresentations and omissions were material;

(c)    The Company's common stock traded in efficient markets;

(d)    The misrepresentations and omissions alleged would induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiffs purchased American Realty common stock between the time Defendants misrepresented or failed to disclose material facts, and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

233.    At all relevant times, the markets for American Realty common stock were efficient for the following reasons, among others: (a) American Realty's common stock was listed, and actively traded, on the NASDAQ, a highly efficient and automated market; (b) American Realty filed periodic reports with the SEC; (c) American Realty regularly

communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services, and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and (d) American Realty was followed by numerous analysts who wrote reports that were published, distributed and entered the public market.  As a result of the foregoing, the market for American Realty's publicly traded common stock promptly digested current information with respect to the Company and reflected such information in the price of American Realty's common stock.  Plaintiffs relied on the price of American Realty's common stock, which reflected all the information in the market, including the misstatements by Defendants.

234.  Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are also predicated upon omissions of material fact which there was a duty to disclose.

235.  In addition, Plaintiffs directly relied on Defendants' false and misleading statements alleged herein when deciding whether to purchase American Realty common stock. During the Relevant Period, Plaintiffs' investments were managed by their investment advisor, Twin Securities, which employed an active strategy based on an analytical, research-based investment processes.  Under this process, a portfolio manager, with the assistance of equity analysts, made the decisions whether to purchase, sell or hold shares for the Plaintiffs.  Analysts produced regular reports on individual companies, including American Realty, and were responsible for advising the portfolio manager about whether to purchase, sell, or hold shares in those companies.  Factors considered by the analysts included, among other things, the financial

performance of the company and a review of the company's strengths, weaknesses and opportunities.  The portfolio manager, in turn, relied on the analysts' reports as an important factor in deciding whether to purchase, sell, or hold shares.

236.    Throughout the Relevant Period, both the portfolio manager and the analysts undertook comprehensive asset valuation analyses and performed rigorous independent and fundamental research including reading and relying upon publicly available information concerning American Realty from the following sources: (a) American Realty's public statements, plans and news releases; (b) American Realty's corporate website and materials posted on its website; (c) analyst reports and earnings conference calls involving American Realty; (d) American Realty's periodic securities filings with the SEC and the NASDAQ; (e) other regulatory filings and reports regarding American Realty; and (f) industry conferences and conference transcripts involving American Realty.

237.    On or about May 6, 2013, Twin Securities, on Plaintiffs' behalf, read and reviewed the First Quarter 2013 Form 10-Q and the First Quarter 2013 Press Release, including specifically, the false and misleading statements identified above in ¶¶102-9.  Each of these documents was filed with the SEC pursuant to the Exchange Act.  In reliance upon the false and misleading statements in those documents, Plaintiffs purchased American Realty common stock on at least 25 separate occasions from May 6, 2013 through August 5, 2013, and were damaged by the fraud detailed herein.

238.    On or about August 6, 2013, Twin Securities, on Plaintiffs' behalf, read and reviewed the Second Quarter 2013 Form 10-Q and the Second Quarter 2013 Press Release, including specifically, the false and misleading statements identified above in ¶¶123-29.  On or about October 22, 2013, Twin Securities, on Plaintiffs' behalf, read and reviewed the Cole

Merger Announcement Press Release, including specifically, the false and misleading statements identified above in ¶¶132-34.  Each of these documents was filed with the SEC pursuant to the Exchange Act.  In reliance upon the false and misleading statements in those documents, Plaintiffs purchased American Realty common stock on at least 39 separate occasions from August 6, 2013 through November 6, 2013, and were damaged by the fraud detailed herein.

239.    On or about November 7, 2013, Twin Securities, on Plaintiffs' behalf, read and reviewed the Third Quarter 2013 Form 10-Q and the Third Quarter 2013 Press Release, including specifically, the false and misleading statements identified above in ¶¶141-47.  On or about December 23, 2013, Twin Securities, on Plaintiffs' behalf, read and reviewed the Cole Merger Proxy Materials, including specifically, the false and misleading statements identified above in ¶¶151-61.  On or about February 7, 2014, Twin Securities, on Plaintiffs' behalf, read and reviewed the February 7, 2014 Press Release, including specifically, the false and misleading statements identified above in ¶¶163-67.  Each of these documents was filed with the SEC pursuant to the Exchange Act.  In reliance upon the false and misleading statements in those documents, Plaintiffs purchased American Realty common stock on at least 14 separate occasions from November 7, 2013 through February 26, 2014, and were damaged by the fraud detailed herein.  Additionally, after relying on the false and misleading statements in the Cole Merger Proxy Materials, Plaintiffs acquired a significant amount of American Realty shares at the closing of the Cole Merger, on or about February 7, 2014, and were damaged by the fraud detailed herein.

240.    On or about February 27, 2014, Twin Securities, on Plaintiffs' behalf, read and reviewed the 2013 Form 10-K and the Fourth Quarter 2013 Press Release, including specifically, the false and misleading statements identified above in ¶¶169-86.  Each of these documents was

filed with the SEC pursuant to the Exchange Act.  In reliance upon the false and misleading statements in those documents, Plaintiffs purchased American Realty common stock on at least nine separate occasions from February 27, 2014 through May 7, 2014, and were damaged by the fraud detailed herein.

241.    On or about May 8, 2014, Twin Securities, on Plaintiffs' behalf, read and reviewed the First Quarter 2014 Form 10-Q and the First Quarter 2014 Press Release, including specifically, the false and misleading statements identified above in ¶¶197-205.  On or about May 8, 2014, Twin Securities, on Plaintiffs' behalf, read and reviewed the Offering Materials for the May 2014 Stock Offering, including specifically, the false and misleading statements identified above in ¶¶208-10.  Each of these documents was filed with the SEC pursuant to the Exchange Act.  In reliance upon the false and misleading statements in those documents, Plaintiffs purchased American Realty common stock on at least 20 separate occasions from May 8, 2014 through July 28, 2014, and were damaged by the fraud detailed herein.

242.    On or about July 29, 2014, Twin Securities, on Plaintiffs' behalf, read and reviewed the Second Quarter 2014 Form 10-Q and the Second Quarter 2014 Press Release, including specifically, the false and misleading statements identified above in ¶¶212-20.  Each of these documents was filed with the SEC pursuant to the Exchange Act.  In reliance upon the false and misleading statements in those documents, Plaintiffs purchased American Realty common stock on at least 27 separate occasions from July 29, 2014 through October 31, 2014, and were damaged by the fraud detailed herein.

243.    In addition, throughout the Relevant Period, certain Twin Securities' employees met directly with representatives at American Realty, including American Realty senior management and Board members. During these meetings, American Realty's representatives

discussed a variety of issues related to Company, including the Company's financial performance, actual and projected growth, mergers and acquisitions, corporate governance and internal financial controls.  Information collected by Twin Securities' employees during meetings with American Realty representatives informed the investment decisions of Plaintiffs' portfolio manager, and was a factor in the decisions to purchase, sell, or hold American Realty stock.

244.   Defendants' false and misleading statements alleged herein had a material influence and were a substantial factor in bringing about Plaintiffs' portfolio manager's investment decisions with respect to American Realty stock.  Plaintiffs' portfolio manager did not, and in the exercise of reasonable diligence could not, have known of Defendants' false and misleading statements alleged herein when deciding that the Plaintiffs should purchase, sell, or hold American Realty common stock during the Relevant Period.

## X.    **LOSS CAUSATION**

245.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the Plaintiffs' economic loss.  As Defendants' false and misleading statements and omissions became apparent to the market, beginning on October 29, 2014, the price of American Realty stock declined precipitously as the artificial inflation was removed, causing substantial damage to the Plaintiffs.

246.   As detailed above, before the market opened on October 29, 2014, American Realty made a series of startling admissions regarding the effectiveness of its internal controls and the accuracy of its financial information.  In direct response to these disclosures, American Realty common stock plummeted, trading as low as $7.85 per share on October 29, 2014, on an extremely heavy volume.  Before the market closed on October 29, 2014, American Realty held a conference call for investors and analysts.  During the call, Defendant Kay provided further detail about the fraud, but attempted to minimize its effects.  Specifically, Defendant Kay

characterized it as "a one-quarter adjustment," implied the fraud was known to, and committed by, just two Company executives and stated that "[n]one of the executives that are currently at the Company have been implicated during the investigation related to the concealment of that error."   Further, he reassured investors that the Company's "controls and processes [had] continued to improve" in recent months.   These assertions were later shown to be false by additional disclosures on October 30, 31, and November 3, 2014.  *See* ¶¶86-90, above.   On October 29, 2014, the price of American Realty common stock closed at $10.00 per share—a decline of nearly 20%—on heavy trading volume of over 231 million shares traded, which was nearly 30-times greater than the average daily trading volume during the Relevant Period.

247.    On the next three consecutive trading days, the price of American Realty's stock price continued to decline by, respectively, 5.8%, 5.8% and 11.5%.  By November 3, 2014, the Company's stock price closed at $7.85, a 36.6% drop from the pre-disclosure price.   The Company's stock price continued to decline during this period as investors absorbed the information provided and learned additional facts about the Company's fraud and its impacts. These declines in American Realty stock were the direct and proximate result of the nature and extent of Defendants' prior materially false and misleading statements and omissions being revealed to the market.  The timing and magnitude of the price declines negate any inference that Plaintiffs' losses were caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' wrongful conduct.

XI.   **CLAIMS FOR RELIEF**

**COUNT I**
**FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT**
**AND SEC RULE 10b-5 PROMULGATED THEREUNDER**
**(Against Defendants American Realty, Schorsch, Block, Kay, McAlister,**
**and Grant Thornton)**

248.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

249.   This claim is brought by Plaintiffs against Defendants American Realty, Schorsch, Block, Kay, McAlister and Grant Thornton for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder.

250.   As alleged above, during the Relevant Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they misrepresented or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

251.   Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs related to the purchase and/or acquisition of American Realty common stock.

252.   Plaintiffs have suffered damages in that, in reliance on the integrity of the market, Plaintiffs paid artificially inflated prices for American Realty common stock.  Plaintiffs would not have purchased or acquired American Realty common stock at the prices they paid, or at all,

if they had been aware that those prices had been inflated by Defendants' misleading statements and omissions.

253.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases and acquisitions of American Realty common stock during the Relevant Period.

**COUNT II**
**VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT**
**AND RULE 14a-9 PROMULGATED THEREUNDER**
**(Against Defendants American Realty, Schorsch, Block, Kay,**
**certain Director Defendants, and the Cole Defendants)**

254.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

255.    This claim is brought by Plaintiffs against Defendants American Realty, Schorsch, Block, Kay, Kahane, Michelson, Rendell and Bowman and the Cole Defendants for violations of Section 14(a) of the Exchange Act, 15 U.S.C. §§ 78n(a), and Rule 14a-9 promulgated thereunder.

256.    SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to § 14(a) of the 1934 Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

257.    As alleged above, Defendants prepared, reviewed and disseminated the false and misleading Cole Merger Proxy, which misrepresented and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

258.     The Cole Merger Proxy contained untrue statements of material fact and omitted to state facts necessary to make the statements made therein not misleading in violation of Section 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  The Cole Merger Proxy was an essential link in the consummation of the Cole Merger.

259.     The Cole Merger Proxy violates Section 14(a) and Rule 14a-9 because it was materially false and misleading and was provided in at least a negligent manner.

260.     As a direct result of the Defendants' preparation, review and dissemination of the false and misleading Cole Merger Proxy as described above, the Plaintiffs were deprived of their right to a fully informed shareholder vote in connection with the Cole Merger.

261.     At all times relevant to the dissemination of the materially false and misleading Cole Merger Proxy, Defendants were aware of and had access to the true facts.  Thus, as a direct and proximate result of the dissemination of the false and misleading Cole Merger Proxy, Plaintiffs suffered damage and actual economic losses.

**COUNT III**
**VIOLATION OF SECTION 18(a) OF THE EXCHANGE ACT**
**(Against Defendants American Realty, Schorsch, Block, Kay, McAlister,**
**and Grant Thornton)**

262.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

263.     This claim is brought by Plaintiffs against Defendants American Realty, Schorsch, Block, Kay, McAlister and Grant Thornton for violations of Section 18(a) of the Exchange Act, 15 U.S.C. §§ 78r.

264.     As alleged above, Defendants filed or caused to be filed with the SEC documents regarding American Realty that contained misrepresented facts and omitted material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

265.    Plaintiffs read and relied upon the documents that Defendants filed or caused to be filed with the SEC prior to purchasing American Realty common stock, including American Realty's periodic financial statements.  Plaintiffs' reliance was reasonable.

266.     Plaintiffs read and relied upon these documents not knowing that such documents contained materially false statements and omissions. Had they known the true facts, Plaintiffs would not have purchased American Realty common stock or would not have purchased them at the inflated price they paid.

267.    When the truth began to emerge about the false and misleading statements and omissions, shares of American Realty common stock declined significantly and Plaintiffs were damaged.

268.    At the time of their purchases and acquisitions of American Realty's common stock, Plaintiffs were not aware of the untrue statements and/or omissions alleged herein and could not have reasonably discovered such untruths or omissions.

## COUNT IV
## VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
### (Against the Corporate, Executive, and Director Defendants)

269.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

270.    This claim is brought by Plaintiffs against the Corporate Defendants, Executive Defendants, and Director Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §§ 78t(a).

271.    The individuals and entities named in this Count acted as controlling persons of American Realty and ARC Properties within the meaning of Section 20(a) of the 1934 Act.  By reason of their positions as officers or directors, or their ownership interest in, American Realty and ARC Properties, the individuals and entities named herein had the power and authority to cause these entities to engage in the wrongful conduct complained of herein.

272.    American Realty is a subsidiary of AR Capital, which is a subsidiary of RCS Capital, the ultimate parent entity of Defendant Schorsch's empire.  As a result, RCS Capital controlled American Realty and ARC Properties during the Relevant Period.  American Realty and ARC Properties were also controlled by AR Capital.  Additionally, American Realty, which was ARC Properties' sole general partner and owned approximately 96.5% of its equity during the Relevant Period, controlled ARC Properties.  AR Capital and American Realty shared executive officers and board members during the Relevant Period, including Defendants Schorsch and Kahane.

**COUNT V**
**NEW YORK COMMON LAW FRAUD**
**(Against Defendants American Realty, ARC Properties, Schorsch, Block,**
**Kay, McAlister, and Grant Thornton)**

273.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

274.    As alleged above, during the Relevant Period, Defendants American Realty, ARC Properties, Schorsch, Block, Kay, McAlister and Grant Thornton misrepresented facts and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

275.    These misrepresentations and omissions constitute fraud and deceit under New York law.

276.    Plaintiffs reasonably relied upon the representations when making decisions to purchase American Realty's shares and did not know of any of the misrepresentations or omissions at that time.

277.    As a direct and proximate result of the fraud and deceit by Defendants, Plaintiffs suffered damages in connection with their investment in American Realty's common stock.

278.    Defendants' wrongful conduct, as described above, was malicious, reckless and willful.  Accordingly, punitive damages, in addition to compensatory damages, are appropriate to deter fraudulent conduct of this kind.

**COUNT VI**
**VIOLATION OF SECTION 11 OF THE SECURITIES ACT**
**(Against American Realty, ARC Properties, certain Executive**
**and Director Defendants, and Grant Thornton)**

279.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein. For purposes of this claim, Plaintiffs expressly disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on claims of strict liability and/or negligence.

280.    This claim is brought by Plaintiffs for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k  against the following Defendants:

| Event | Date | Entities | Individuals |
|-------|------|----------|-------------|
| Cole Merger | 2/2014 | American Realty, ARC Properties | Schorsch, Kay, Block, Kahane, Michelson, Rendell, Bowman |
| May 2014 Offering | 5/2014 | American Realty, ARC Properties, Grant Thornton | Schorsch, Block, Kahane, Rendell, Michelson, Bowman, Kay, McAlister, Stanley, Andruskevich and Sealy |

281.    The Registration Statements and Prospectuses issued in connection with the offerings identified above were false and misleading and omitted to state material facts required

to be stated therein, contained untrue statements of material facts, and omitted to state facts necessary to make the statements made therein not misleading.

282.    American Realty is the registrant for the Cole Registration Statement and the Shelf Registration Statement.  ARC Properties is a subsidiary and the operating partnership of American Realty, and American Realty is ARC Properties' sole general partner.  Substantially all of American Realty's business during the Relevant Period was conducted through ARC Properties.  American Realty and ARC Properties are strictly liable to Plaintiffs for the misstatements and omissions in the applicable Registration Statements and Prospectuses.

283.    The Individual Defendants identified above were responsible for the contents and dissemination of the Registration Statements and Prospectuses.  Each of these Individual Defendants signed or authorized the signing of the Registration Statements and Prospectuses, and participated in the preparation and dissemination of the Registration Statements and Prospectuses.  As a signatory to one or more of the Registration Statements and Prospectuses, each is liable to Plaintiffs for the misstatements and omissions contained within those Registration Statements and Prospectuses pursuant to Section 11 of the Securities Act.

284.    Grant Thornton consented to the inclusion of its report on American Realty's false financial statements in the Registration Statements and Prospectuses in connection with the May 21, 2014 Stock Offering as described in ¶¶185, 210, above.

285.    The Defendants named herein did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the Registration Statements and Prospectuses used in connection with the Cole Merger and the May 2014 Stock Offering and did not possess reasonable grounds for believing that the statements made therein were not false and/or misleading.

286.    Plaintiffs purchased or acquired the stock described above pursuant or traceable to the Registration Statements described in ¶¶66, 208-10.  As a direct and proximate result of the misrepresentations and omissions contained in those Registration Statements, Plaintiffs suffered substantial damages.

287.    At the time of their purchases and acquisitions of American Realty's common stock, Plaintiffs were not aware of the untrue statements and/or omissions alleged herein and could not have reasonably discovered such untruths or omissions.

## COUNT VII
## VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT
### (Against American Realty, ARC Properties and certain Executive and Director Defendants)

288.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein. For purposes of this claim, Plaintiffs expressly disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on claims of strict liability and/or negligence.

289.    This claim is brought by Plaintiffs for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77k, by the following Defendants:

| Event | Date | Entities | Individuals |
|---|---|---|---|
| Cole Merger | 2/2014 | American Realty, ARC Properties | Schorsch, Kay, Block, Kahane, Michelson, Rendell, Bowman |
| May 2014 Offering | 5/2014 | American Realty, ARC Properties | Schorsch, Block, Kay, McAlister, Kahane, Rendell, Michelson, Bowman, Stanley, Andruskevich and Sealy |

290.    The Registration Statements and Prospectuses issued in connection with the offerings identified above were false and misleading and omitted to state material facts required

to be stated therein, contained untrue statements of material facts, and omitted to state facts necessary to make the statements made therein not misleading.

291.    American Realty is the registrant for the Cole Merger and the May 2014 Stock Offering.  ARC Properties is a subsidiary and the operating partnership of American Realty, and American Realty is ARC Properties' sole general partner.  Substantially all of American Realty's business during the Relevant Period was conducted through ARC Properties.  American Realty and ARC Properties are strictly liable to Plaintiffs for the misstatements and omissions in the applicable Registration Statements and Prospectuses.

292.    Defendants identified above were statutory sellers who sold and assisted in the sale of securities to Plaintiffs by means of the defective Prospectuses and Prospectus Supplements and did so for personal gain.

293.    Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths contained and/or omissions from the Prospectuses and Prospectus Supplements at the time Plaintiffs acquired American Realty common stock.

294.    As a direct and proximate result of Defendants' violations of Section 12(a)(2) of the 1933 Act, Plaintiffs sustained substantial damages in connection with their purchases of the common stock pursuant to the Registration Statements, Prospectuses and Prospectus Supplements.

295.    Plaintiffs have the right to rescind and recover the consideration paid for their securities, upon tender of their securities to the Defendants named in this Count.

296.    At the time of their purchases and acquisitions of American Realty's common stock, Plaintiffs were not aware of the untrue statements and/or omissions alleged herein and could not have reasonably discovered such untruths or omissions.

## COUNT VIII
## VIOLATION OF SECTION 15 OF THE SECURITIES ACT
### (Against RCS Capital, AR Capital, American Realty and certain Executive and Director Defendants)

297.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein. For purposes of this claim, Plaintiffs expressly disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on claims of strict liability and/or negligence.

298.    This claim is brought by Plaintiffs for violations of Section 15 of the Securities Act, 15 U.S.C. § 77k, against the following Defendants:

| Event | Date | Entities | Individuals |
|-------|------|----------|-------------|
| Cole Merger | 2/2014 | RCS Capital, AR Capital, American Realty | Schorsch, Kay, Block, Kahane, Michelson, Rendell, Bowman |
| May 2014 Offering | 5/2014 | RCS Capital, AR Capital, American Realty | Schorsch, Block, Kay, McAlister, Kahane, Rendell, Michelson, Bowman, Stanley, Andruskevich and Sealy |

299.    American Realty is a subsidiary of AR Capital, which is a subsidiary of RCS Capital, the ultimate parent entity of Defendant Schorsch's empire.  As a result, RCS Capital controlled American Realty and ARC Properties during the Relevant Period.  American Realty and ARC Properties were also controlled by AR Capital.  Additionally, American Realty, which was ARC Properties' sole general partner and owned approximately 96.5% of its equity during the Relevant Period, controlled ARC Properties.  AR Capital and American Realty shared executive officers and board members during the Relevant Period, including Defendants Schorsch and Kahane.

300.    At various times during the Relevant Period, Defendants Schorsch, Block, Kay, McAlister, Kahane, Michelson, Rendell, Bowman, Andruskevich, Stanley, and Sealy were executive officers and/or directors of, and exercised control over, American Realty.

301.    By virtue of the foregoing, the individuals and entities described above each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of American Realty, including the contents of the Registration Statements and Prospectuses for the Cole Merger and the May 2014 Stock Offering.

302.    By reason of their control person status, as alleged above, RCS Capital, AR Capital, American Realty and the individuals named in this claim are jointly and severally liable for the underlying violations of the Section 15 of the 1933 Act.

## XII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.      Awarding Plaintiffs compensatory damages in amount to be proven at trial for all injuries sustained as a result of Defendants' wrongdoing, including all interest thereon;

B.      Awarding Plaintiffs injunctive and other equitable relief, including rescission, as appropriate, in addition to any other relief that is just and proper under the circumstances;

C.      Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other relief as this Court may deem just and proper.

## XIII.   <u>JURY TRIAL DEMAND</u>

Plaintiffs hereby demand a trial by jury in this action for all issues so triable.

Dated: February 20, 2015                        Respectfully submitted,

BERNSTEIN LITOWITZ BERGER                    BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP                             & GROSSMANN LLP

_____                    _____
BLAIR A. NICHOLAS                            MARK LEBOVITCH
JONATHAN D. USLANER                          1285 Avenue of the Americas, 38th Floor
MATTHEW P. JUBENVILLE                        New York, NY 10019
DAVID KAPLAN                                 Tel:    (212) 554-1400
12481 High Bluff Drive, Suite 300            Fax:    (212) 554-1444
San Diego, CA 92130                          markl@blbglaw.com
Tel:    (858) 793-0070
Fax:    (858) 793-0323
blairn@blbglaw.com
jonathanu@blbglaw.com
matthewj@blbglaw.com
davidk@blbglaw.com

*Counsel for Plaintiffs*